In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2383

Vonaire T. Washington,

Petitioner-Appellee,

v.

Judy Smith, Warden,
Oshkosh Correctional Institution,

Respondent-Appellant.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 97-C-0424--Lynn Adelman, Judge.

Argued February 24, 2000--Decided July 6, 2000

Before Posner, Chief Judge, Cudahy and Evans,
Circuit Judges.

Cudahy, Circuit Judge.  On September 17, 1991, a
Wisconsin jury convicted Vonaire Washington of
two counts of being party to an armed robbery and
one count of being a felon in possession of a
firearm. The state court sentenced Washington to
consecutive prison terms totaling 22 years
imprisonment. Washington filed a post-conviction
motion in the trial court, claiming that at trial
he was denied effective assistance of counsel,
and following a two-day evidentiary hearing, the
trial court denied that motion. Washington
appealed, and the Wisconsin Court of Appeals
affirmed his conviction in an unpublished
opinion. The Wisconsin Supreme Court denied
Washington's petition for review.

Washington then filed an application for a writ
of habeas corpus under 28 U.S.C. sec. 2254 in the
United States District Court for the Eastern
District of Wisconsin, again arguing ineffective
assistance of counsel. The district court found
that Washington had been denied effective
assistance of counsel and was prejudiced as a
result and that the state-court decisions
involved an unreasonable application of
Strickland v. Washington, 466 U.S. 668 (1984).
The district court granted Washington's
application on August 29, 1999, and the State

appeals that decision. We affirm.

I. Background

  A. The Robbery

  On Sunday July 15, 1990, at about four o'clock in the afternoon, three men entered the Jolly Skot Tavern in Milwaukee and robbed the owner/bartender--James D. Johnson/1--and two patrons--Jane Dornuf and James Earl Davis--at gunpoint. The first of the three men entered carrying a shotgun, leapt onto a barstool and then onto and over the bar, pointing the shotgun at the bar owner, who at that point was lying face down on the floor. The man who had jumped over the bar then asked, "Should I pop him?" One of the other robbers responded, "Pop him," and then repeated, "Well, pop him," but the man with the shotgun did not. Instead, he took approximately 200 dollars from the bar owner's pockets. The second robber, armed with a silver handgun, took Dornuf's wallet and cash and also robbed Davis. The third robber remained by the door, and after about ten minutes, the three men left.

  About two hours later, the police stopped three men-- Leother Lobley, Clifford Beasley and Vonaire Washington--in a car at the 1600 block of North 29th Street. The police found a large blue gym bag containing two 12-gauge shotguns and shells on the floor in front of the front passenger seat. All three men were placed under arrest and were escorted to the Jolly Skot Tavern in handcuffs. At the tavern, the bar owner was unable to identify any of the three men as one of the robbers. The patrons performed better: Dornuf identified Washington as one of the participants in the robbery, and Davis also identified Washington as one of the robbers.

  On July 18, 1990, the police conducted a lineup at the police station. Washington was not part of this, or any other, lineup at the police station. However, the day before, Washington's soon-to-be codefendant, James L. Johnson, had been arrested,/2 and Johnson occupied position number two in the lineup. The bar owner and the two patrons took a look. The bar owner, just as before in the bar, could not make any visual identification. However, the lineup participants were instructed to say the phrase "Should I pop him?", and the bar owner then identified codefendant Johnson as one of the robbers. Davis failed to positively identify any member of the lineup, but Dornuf later, when she was shown a photograph of the lineup, identified Johnson as one of the robbers. Both Washington and Johnson were charged in connection with the robbery of

the Jolly Skot, and the case proceeded to trial.


   B.  Washington on Trial

   On the second day of trial--after jury selection but before the presentation of evidence began--Washington addressed the court regarding his concerns about his representation. Washington asserted that he had asked his attorney, Mr. Isadore Engle, to subpoena numerous alibi witnesses but Mr. Engle had failed to do so. He also told the trial court that Mr. Engle had never discussed trial strategy and witnesses with him. See Ex. P at 4-8. The court responded, saying, "I assume your lawyer knows what an alibi witness is and which witnesses would be allowed to testify and which wouldn't. He's trained in the law. He's got a good reputation. The matter is scheduled for trial right now. He's ready to proceed. I'm not going to adjourn it." Id. at 6-7. After this ruling, Mr. Engle volunteered that "[Washington] told me he had an alibi. I filed an alibi. . . . He comes forward with matters before the Court that he asked for certain witnesses I didn't produce. He never asked for one." Id. at 8. The court called the jury, and the testimony began.

   The State's case against Washington consisted of testimony from the bar owner, patrons Jane Dornuf and James Davis, and Officer Arrastia (one of the officers who arrested Washington). At trial, the bar owner could not visually identify any of the participants in the robbery. When asked to point to the person whose voice he had recognized at the lineup, although the situation is not entirely clear, the bar owner apparently pointed at Washington. Mr. Engle did not object or cross-examine the bar owner about the fact that he had never identified Washington, by voice or otherwise./3 Ms. Dornuf testified that Washington was the man with the shotgun and that he had robbed the bar owner, but she admitted on cross-examination (by codefendant Johnson's counsel) that she "may have" told the police that she was "positive" Johnson was the robber with the shotgun when she saw the photograph of the lineup. She also admitted that at the preliminary hearing she "couldn't be sure" who carried the shotgun and "couldn't be sure" who robbed the bar owner. Davis recounted the story of the robbery and testified that the police brought two men to the Jolly Skot after the robbery. He identified Washington both as one of these men and as one of the robbers. Davis also testified that he was unable to identify anyone in the lineup (although number four, who was one of the decoys, "look[ed] very familiar"). Officer Arrastia testified that, when the police stopped the car on 29th Street,

he saw Washington get out of the front passenger seat and that another officer found a blue duffle bag containing two shotguns and shells on the front passenger floor.

Washington testified in his defense, as did two alibi witnesses. Washington testified that on the day of the robbery, he was staying with Sandra Blue and had borrowed her car at about noon to go to Gola Richardson's house. Richardson lived near the corner of 24th and Vine in Milwaukee. After his arrival at Ms. Richardson's, he watched The Great Escape, starring Steve McQueen, on television with Richardson, her sister Sharon Brown/4 and her brother David Brown. After the movie, Washington and David Brown went out on the porch to talk. It was raining, but after the rain stopped, Jerome Pickens-- whom Washington had never met before--joined them to chat. Washington further testified that they heard men down the street arguing and went to see what was happening. One of the arguing men pulled a gun and fired at a house. The shooter then jumped on a motorcycle, and as he rode off, a second man came into the street and shot at the fleeing man. After the action ended, Washington, David Brown and Pickens were (quite understandably) discussing the incident when Sandra Blue paged Washington on his beeper. Washington went to a tavern near the corner of 24th and Vine--there was no phone at Gola Richardson's--at about 3:30 or 4:00 to call Blue. Blue wanted her car back, but Washington told her that it would not start, and that he was stranded at Gola Richardson's house. Washington returned to Gola Richardson's house, and around 5:00 or 5:45, two acquaintances of Washington's pulled up in a car. The car was driven by Leother Lobley, and Washington testified that he got into the back seat of the car (saying that Officer Arrastia was "incorrect" to say that he had been in the front seat), and they left. The police stopped this car shortly thereafter and arrested the three occupants.

The only two alibi witnesses that testified for Washington at trial were Sandra Blue and Jerome Pickens. Blue testified that on the day of the robbery she let Washington borrow her car around noon. She paged Washington at about 4:00. She wanted her car, but he called her back and told her that it would not start and asked her to have his brother come pick him up at Gola Richardson's. During cross-examination, she admitted to having two prior convictions. Washington's other alibi witness, Jerome Pickens, testified that he saw Washington at Gola Richardson's house on the day of the robbery. He testified that he was with Washington--whom, he said, he had met for the first time that day-- from about 2:00 or 2:30 until about 6:00, except

at 5:00 when Washington left to make a phone call. He saw the shooting take place around 3:30. Pickens also admitted having two prior convictions.

At the conclusion of the four-day trial, the jury rejected Washington's alibi defense and found him guilty as charged. Washington retained new counsel before sentencing, and the court sentenced Washington to a total of 22 years in prison. Washington, through his new counsel, filed a motion for post-conviction relief on the ground that he had been denied effective assistance of counsel in the trial court. The court held an evidentiary hearing on November 16 and 17, 1992.

C.   The Post-Conviction Hearing

The first witness at the post-conviction hearing was Washington's former counsel, Isadore Engle. Mr. Engle, who has been practicing criminal law since 1944, testified that Washington had given him Gola Richardson's name some time before trial and that he listed Ms. Richardson on the Notice of Alibi he filed on April 22, 1991. Mr. Engle claimed that this was the only name Washington gave him before trial, but he could not find notes on the substance of any of his pre-trial meetings with his client. Mr. Engle further testified that he had attempted to contact Gola Richardson about three times by visiting her home (recall, she did not have a telephone), but he never interviewed her. Mr. Engle left his business card with someone at her residence but never heard from her. He did not seek the assistance of an investigator to contact her, and, although she was scheduled to testify on June 13, he did not give the sheriff a subpoena for Ms. Richardson until June 11 (the second day of trial). By the time the subpoena was served, Gola had left town for the week; therefore, she did not testify at trial.

Although Mr. Engle had told the trial court that Washington "had never asked for one" witness besides Gola Richardson, he testified at the post-conviction hearing that Washington gave him a list of additional witnesses immediately before the trial began. That list identified Jerome Pickens, Sandra Blue, Sharon Brown, David Brown, Leother Lobley, Clifford Beasley and others as additional witnesses, but Mr. Engle made no attempt to contact any of these individuals. Mr. Engle explained this failure by stating: "There was no way I could have an opportunity to contact them at that late time. I was busy trying the case." Ex. W at 17. Washington, however, while in custody awaiting trial, actually managed to

contact Sandra Blue and Jerome Pickens on his own and secured their testimony for his defense. Testimony had to be reopened twice to allow these witnesses to testify. Although he did not help contact them, Mr. Engle did manage to find time to talk to Blue and Pickens immediately before each testified. Mr. Engle also testified at the post-conviction hearing that it was "brand new material" when Washington testified that he was with Sharon Brown, David Brown and Jerome Pickens on the day the Jolly Skot was robbed.

   Mr. Engle was also questioned about a copy of a police report he admittedly received months prior to trial. The two-page report had been prepared by Detective Clifford Hudlet, and that report contained statements Leother Lobley made to Detective Hudlet after Clifford Beasley, Washington and Lobley were arrested, explaining that the shotguns found in the car were not Washington's but that they had been placed there by "Shorty G." earlier in the day. The report also reflected that Lobley told Detective Hudlet that Washington knew nothing about the shotguns being in the car. The questioning of attorney Engle went as follows:

Q: Now, in your preparing for this case, did you read those two pages [of the police report]?

A: I did but I couldn't make out too much of what it said because the writing is bad.

. . .

Q: Did you do anything to attempt to decipher the handwriting that you find difficult to read?

A: I deciphered it as best I could.

Q: Do you feel you understand or were able to understand the contents of that statement by Mr. Lobly [sic]?

A: Not very much.

. . .

Q: So, during your preparation for this case, assuming that that statement does say that Shorty G. gave this to them, a large blue gym bag, you never had that information in your head when you prepared this case; is that right?

A: That's right.

Ex. W at 4-6. Perhaps as an obvious consequence of being ignorant of the contents of the reports, Mr. Engle did not attempt to speak with Lobley prior to or during the trial.

Gola Richardson testified at the post-conviction hearing, where she explained that Washington had been with her, Sharon and David Brown and Jerome Pickens at her home until at least 6:00 on the day the Jolly Skot had been robbed. She also testified that there was a shooting down the street that day and that Washington's car would not start. No one had contacted her regarding testifying at Washington's trial, nor had she received the business card Mr. Engle claimed to have left for her. David Brown also testified, and he said that Washington was with him, Gola Richardson, Sharon Brown and Jerome Pickens all afternoon on that day. He also recalled that there was a shooting incident. Brown testified that someone came to talk to him about the case, but he did not recognize Mr. Engle (who was at the hearing), and the person who had talked to him never contacted him again. Washington also testified briefly, claiming that he had given Mr. Engle the names of Sharon and David Brown, as well as Jerome Pickens, well before the trial began, in direct contradiction to Mr. Engle's testimony. It was Washington's understanding that they were going to be listed on the Notice of Alibi with Gola Richardson.

D.  State-Court Rulings

The Wisconsin trial court made no specific findings of fact and found nothing wrong with Washington's representation at trial: the court found that Mr. Engle "under all the circumstances was not inefficient [sic], [and] that his performance did not fall below the standard of a reasonably competent attorney in his community, or an average attorney in his community . . . ." Ex. W at 94. The court also noted that Mr. Engle's failure to subpoena Gola Richardson at an earlier date was "unfortunately . . . not an unusual way of proceeding in these criminal cases." Id. at 92. The court also, without making any specific findings of fact, apparently credited Engle's story that he had not heard about Sharon or David Brown until immediately before trial. The court said nothing about Lobley or the unread police report. The Wisconsin Court of Appeals affirmed and stated that Mr. Engle's "efforts to contact [Richardson] and have her appear for trial were 'reasonable[ ] under prevailing professional norms,'" State v. Washington, 514 N.W.2d 879, 1994 WL 51669, at *2 (Wis. App. Feb. 22, 1994) (quoting Strickland, 466 U.S. at 688), and found the circuit court's implicit factual findings "not clearly erroneous," id. The court did find Engle's failure to read the police report deficient performance but found that this failing was harmless. The Wisconsin Supreme Court denied

review.


E.  Federal Court


On April 21, 1997, Washington filed this application for a writ of habeas corpus under 28 U.S.C. sec. 2254 in the Federal District Court for the Eastern District of Wisconsin. The district court granted that application. The district court found that the state courts' determinations that (1) Mr. Engle's failure to subpoena Gola Richardson was excusable, (2) Engle's failure to interview Sharon or David Brown (or call them as witnesses) was excusable and (3) any deficient performance by Mr. Engle was not prejudicial to Washington's case were all unreasonable applications of Strickland v. Washington. The district court therefore granted Washington's application, and the State appeals.

II.  Analysis


Our decision in this case is governed by the increasingly familiar standards established by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA). Under AEDPA, we cannot grant Washington the relief he seeks unless the state-court adjudication resulted in a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. sec. 2254(d)(1). The Supreme Court has recently expounded on the proper application of sec. 2254(d)(1) in its Williams v. Taylor, 120 S. Ct. 1495 (2000), decision. Briefly, in order to secure a writ under sec. 2254(d)(1), Washington must satisfy one of the following two conditions: "the state-court adjudication resulted in a decision that (1) 'was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'involved an unreasonable application of . . . clearly established Federal law as, determined by the Supreme Court of the United States.'" Williams, 120 S. Ct. at 1523. The statutory phrase "clearly established Federal law as determined by the Supreme Court of the United States," is a critical limitation under sec. 2254(d)(1) and refers to, obviously enough, "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id. The district court found the Wisconsin Court of Appeals decision denying Washington relief to be an unreasonable application of Strickland, and granted his application for a writ of habeas corpus accordingly. We review the district court's decision to grant habeas relief de novo.

See Schaff v. Snyder, 190 F.3d 513, 522 (7th Cir. 1999).

Washington claims that he was denied his right to effective assistance of counsel under Strickland, and "[i]t is past question that the rule set forth in Strickland qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Williams, 120 S. Ct. at 1512. Under Strickland, a prisoner must show both that counsel's representation fell below an objective standard of reasonableness and that he was prejudiced as a result. See Strickland, 466 U.S. at 687. The performance standard gives a wide latitude of permissible attorney conduct, and a prisoner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689 (quotation omitted). If the prisoner has identified specific omissions, the court must determine "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id. at 690. Once the prisoner establishes his counsel's ineffectiveness, he must still demonstrate prejudice: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. Our task is to determine whether the Wisconsin Court of Appeals rejection of Washington's ineffective-assistance claim was either "contrary to, or involved an unreasonable application of" the performance and prejudice rules set out in Strickland. See Williams, 120 S. Ct. at 1512. If either of these two measures of error apply, Washington is entitled to relief.

Courts have been wrestling with the precise meaning and scope of the statutory phrase "contrary to, or involved an unreasonable application of" under sec. 2254(d)(1), but a good part of that struggle is over, thanks to the recent Williams decision. First, Williams clarifies that, although they will often overlap, the phrases "contrary to" and "unreasonable application of" have independent meaning. See 120 S. Ct. at 1520. In order for the state court's decision to be considered "contrary to . . . clearly established Federal law as established by the United States Supreme Court," that state court's decision must be "substantially different from relevant [Supreme Court] precedent." Id. at 1519. Thus, under the "contrary to" clause of sec. 2254(d)(1), we could grant a writ of habeas corpus in what would seem to be a narrow range of cases where the state court applied a rule that contradicts the governing law as expounded in

Supreme Court cases or where the state court confronts facts materially indistinguishable from a Supreme Court case and nevertheless arrives at a different result. Such decisions would be "contrary to" clearly established federal law within the meaning of sec. 2254(d)(1). See id. at 1519. However, if the state court applied the proper rule, yet reached a conclusion that the federal habeas court would not have independently reached, the federal court cannot grant the writ based on the "contrary to" clause. See id. at 1520.

The analysis under the "unreasonable application of" clause, however, seems broader in that it allows a federal habeas court to grant habeas relief whenever the state court "unreasonably applie[d] [a clearly established] principle to the facts of the prisoner's case." Williams, 120 S. Ct. at 1523. But, lest we think that this provides us grounds for independent review of state court decisions on questions of federal law, the Supreme Court cautions that we must bear in mind that "an unreasonable application of federal law is different from an incorrect application of federal law." Id. at 1522 (emphasis in original). When determining if a state court decision "involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States," it seems that we are not permitted to substitute our independent judgment as to the correct outcome--as we could in a context, for example, where we review a federal district court decision de novo. Rather, a federal habeas court operating pursuant to sec. 2254(d)(1) must only ask if the state-court decision was reasonable. Or, to put it slightly differently, we must determine that the state-court decision was both incorrect and unreasonable/5 before we can issue a writ of habeas corpus. See id.

Our inquiry begins by looking at the decision of the Wisconsin Court of Appeals. The legal analysis in its unpublished opinion is sparse-- the opinion mainly recites facts. See Washington, 1994 WL 51649. The Wisconsin Court of Appeals addressed four omissions Washington claimed demonstrated Mr. Engle's deficiency as counsel: (1) Mr. Engle's failure to produce Gola Richardson as a witness at trial; (2) Mr. Engle's failure to read the police report or speak with Leother Lobley; (3) Mr. Engle's failure to interview Sharon or David Brown or produce them as witnesses at trial; and (4) Mr. Engle's failure to effectively cross-examine the bar owner.

A.  Mr. Engle's Performance

The Wisconsin Court of Appeals properly identified Strickland v. Washington as the source of the rule to determine whether Mr. Engle's trial performance deprived Washington of his Sixth Amendment right to effective assistance of counsel, see Washington, 1994 WL 51649, at *2 ("The lawyer's efforts to contact [Gola] Richardson and have her appear for trial were 'reasonable [ ] under prevailing professional norms.' Strickland, 466 U.S. at 688."), so it was certainly not "contrary to" clearly established federal law, here Strickland, in this respect. The state court rejected Washington's claims that Mr. Engle rendered ineffective assistance by failing to produce Gola Richardson as an alibi witness at trial. See Washington, 1994 WL 51649, at *2. The court found that Mr. Engle's three attempts to speak with Ms. Richardson and his filing a subpoena two days before her testimony was scheduled was "'reasonable under prevailing professional norms.'" Id. (quoting Strickland, 466 U.S. at 688). The court also implicitly concluded that because Mr. Engle did not find out about Sharon or David Brown until the trial began, his failure to investigate them was not ineffective assistance under Strickland either. See id. The Wisconsin Court of Appeals did, however, find Mr. Engle's failure to read the police report to be deficient performance. See id. We believe, that by finding Engle's complete failure to read the police report (deciphering its handwriting if necessary) to be deficient performance, the Wisconsin Court of Appeals applied Strickland in an entirely reasonable fashion. We are, however, unpersuaded of the reasonableness of the court's remaining performance and prejudice conclusions.

Gola Richardson was going to be a critical witness at Washington's trial, and she was the only witness listed on Washington's pre-trial Notice of Alibi. Mr. Engle filed this Notice of Alibi on April 22, 1991, but in the following month-and-a-half before the trial, he failed to contact her. According to his testimony, Mr. Engle tried to contact Gola Richardson three times--each time without success. He claims to have left his business card at what he thought was Ms. Richardson's house, but he took no additional steps to reach her when she did not contact him. He did not seek the assistance of an investigator. Nor did he seem to take into account, in the timing of her subpoena, that Ms. Richardson was hard to reach. He subpoenaed her on the second day of trial, just two days before this woman he could never find was to testify for his client. The best justification for Mr. Engle's delay was given by the trial court in denying Washington's post-conviction motion:

[U]nfortunately [this] is not an unusual way of proceeding in these criminal cases. They often get adjourned so often that in order not to frustrate the witnesses, the attorneys don't subpoena until they're actually going to testify. . . . That's a sad commentary on some of the crowded calendars that the courts are working under, but it happens more often than we like where we have several cases scheduled and ultimately one of those goes on and some of the others have to be adjourned. . . . So I don't find that particularly unusual.

Ex. W at 92-93. The Wisconsin Court of Appeals merely commented, "The trial court credited the lawyer's testimony and concluded that the lawyer was not ineffective. We agree." Washington, 1994 WL 51649, at *2. We emphatically do not agree. Under Strickland, lawyers are granted wide latitude to make reasonable strategic decisions, see 466 U.S. at 689, but placing witness convenience above the vital interests of his client does not make Mr. Engle's decision reasonable--or even really strategic. The delayed issuance of a subpoena may be justified as a reasonable tactic if, for example, the strategy is to keep the identity of a defense witness from the State. See Huffington v. Nuth, 140 F.3d 572, 579 (4th Cir. 1998). Here, however, Mr. Engle had no semblance of a tactical reason for the delay, nor can we think of one for him. His delay fails to demonstrate the kind of minimal diligence in trying to secure Ms. Richardson as a witness for trial an effective counsel would have displayed. Especially given that he was well-aware of the fact that Gola Richardson was hard to find, and despite the claim that this may be typical performance in Wisconsin's criminal courts, Mr. Engle's failure to produce Gola Richardson for trial, given his minimal attempts to contact her and his failure to subpoena her until two days before she was to testify does not fall within "the range of professionally competent assistance" under Strickland. 466 U.S. at 690. Mr. Engle's performance falls so wide of the mark, that we are left with the conviction that the Wisconsin Court of Appeals decision to the contrary was an unreasonable application of Strickland's performance standard.

The Wisconsin Court of Appeals also rejected Washington's argument that Mr. Engle was ineffective in failing to produce or even to contact Sharon Brown or David Brown. The court rested this conclusion on the fact that the trial court credited Mr. Engle's testimony that he first learned that Washington was with the Browns at Gola Richardson's house when Washington testified to that effect on the stand. See

Washington, 1994 WL 51649, at *2./6 But Mr. Engle also testified at the post-conviction hearing that Washington had given him Sharon Brown's and David Brown's names, along with many others, immediately before trial. The trial court and the Court of Appeals apparently credited this statement as well. Based on this testimony by Mr. Engle, we infer that, when he received the names on the first day of trial, he did not ask Washington about any of the proposed witnesses, nor did he ever attempt to ascertain what they might contribute to his case. Mr. Engle explained his failure at the post-conviction hearing:

Q: Did [Washington] indicate to you why he thought those fourteen people/7 named there might be important as witnesses in this case?

A: We didn't even have time to discuss it because the trial started immediately thereafter.

Q: Did you request an adjournment based on this potentially new information or new witnesses?

A: No, I didn't. Because I had been asking him for a list of witnesses for months, and it certainly isn't the Court's fault nor is it my fault if I don't get this material when it's asked for. I can't blame the Court and ask for a postponement when you don't get the cooperation of your client.

. . .

Q: So aside from Gola Richardson and [Washington's former counsel], did you know any of those other people on that list from your discussions with Mr. Washington or your investigation of the case?

A: No.

Q: Did you discuss those names with him at all during the breaks/8 in the course of the trial?

A: No, I didn't.

. . .

Q: Did you ever ask him if those potential witnesses had phone numbers that Mr. Washington could provide to you?

A: I asked him to provide [the witnesses] at the trial if he could do so and he did produce two of them. Namely, he produced Sandra Bloe [sic] and he produced Jerome Pickens, and I used both of them.

Q: In other words, you left it to your client to try to get those witnesses to court?

A: There was no way I could have an opportunity to contact them at that late time. I was busy trying the case.

Ex. W. at 15-17. Based on this testimony, not only is it clear that Mr. Engle never attempted to contact Sharon or David Brown, but he never attempted to contact a single witness besides Gola Richardson. Mr. Engle owed Washington "a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary," Strickland, 466 U.S. at 691, and a failure to investigate can certainly constitute ineffective assistance. See, e.g., White v. Godinez, 143 F.3d 1049, 1055 (7th Cir. 1998). Telling a client, who is in custody awaiting trial, to produce his own witnesses (as did Mr. Engle) falls painfully short of conducting a reasonable investigation, especially given that Sharon and David Brown did not have a telephone. Perhaps Washington could have dispatched a pigeon from his prison cell with a message for the Browns, but, short of this, it is wholly unreasonable for a lawyer to instruct his incarcerated client to get in touch with people who don't have a phone. Further, as we have noted, Mr. Engle admitted that he did no investigating because of the "late date" and because he was "busy trying the case." It is hard to imagine what kind of case Mr. Engle was thinking of presenting, given that he had never spoken to a single witness.

The failure to investigate a particular lead may be excused if a lawyer has made a "reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. But here, Mr. Engle was simply too "busy" and apparently gave no thought to the potential benefits of investigation. The Wisconsin Court of Appeals never explicitly found this to be effective assistance, instead merely stating, "Furthermore, Washington has not demonstrated that the trial lawyer's failure to seek the adjournment satisfies the prejudice component of the two-part Strickland test." Washington, 1994 WL 51649, at *3. To the extent that this implies that the state court might have concluded that Mr. Engle had rendered effective assistance while failing even to attempt to contact any other witness besides Ms. Richardson, that conclusion would have been based on an unreasonable understanding of Strickland's requirement that an attorney conduct a reasonable investigation in connection with his client's case.

Thus, Washington has identified three aspects in which Mr. Engle's performance fell below that of a reasonably competent, professional attorney.

Even the Wisconsin Court of Appeals found the failure to read the police report ineffective, and had it properly applied Strickland, it would have concluded that Mr. Engle's failure to subpoena a hard-to-find witness until the eleventh hour and his failure to try to ascertain what exculpatory evidence "new" witnesses might have were flagrant examples of ineffective assistance. Therefore, the Wisconsin Court of Appeals adjudication "involved an unreasonable application" of the attorney performance standard contained in Strickland.

## B.  Prejudice to Washington

But demonstrating that his trial counsel was egregiously ineffective--which he has certainly done--is not enough to secure Washington his desired writ of habeas corpus. In order to get relief, Washington must also show that he was prejudiced by Mr. Engle's ineffective assistance. See Strickland, 466 U.S. at 691. Under Strickland, Washington "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. The Supreme Court has also stated, however, that "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." Lockhart v. Fretwell, 506 U.S. 364, 369 (1993). See also Nix v. Whiteside, 475 U.S. 157, 175-76 (1986) (explaining that even if a defendant's perjury might have led to an acquittal, it is not fundamentally unfair to conclude that he was not "prejudiced" by counsel's interference with his intended perjury). There is some superficial tension between Strickland's statement of the prejudice standard, which looks to outcome determination, and Lockhart's, which looks beyond outcome determination to the fundamental fairness of the proceeding, but this tension evaporates when one understands that the heightened prejudice standard in Lockhart "concerns the unusual circumstance where the defendant attempts to demonstrate prejudice based on considerations that, as a matter of law, ought not inform the inquiry." Lockhart, 506 U.S. at 373 (O'Connor, J., concurring). The Supreme Court recently removed all doubt--again in its recent Williams decision--that Strickland governs the prejudice inquiry in most habeas cases and that the decision in Lockhart does "not justify a departure from a straight-forward application of Strickland when the ineffectiveness of counsel does deprive the defendant of a substantive or procedural right to which the law entitles him." Williams, 120 S. Ct. at 1513 (emphasis in

original). The Wisconsin Court of Appeals apparently did not fully grasp the proper interaction between Strickland and Lockhart in determining that Washington did not show prejudice, and in so doing, its decision was both "contrary to" and "involved an unreasonable application of" the proper prejudice analysis prescribed by the Supreme Court.

While holding that Washington had not satisfied the prejudice requirement, the Wisconsin Court of Appeals apparently applied the prejudice standard enunciated in Lockhart, explaining that "Washington has not demonstrated that his trial lawyer's failure to read the police report of the interview with Lobley, and his subsequent failure to call Lobley as a witness, made 'the result of the trial unreliable or the proceeding fundamentally unfair.' See Lockhart, 113 S. Ct. at 844." Washington, 1994 WL 51649, at *2. See also id. at *3 ("[W]e cannot say that [Sharon Brown's and David Brown's] failure to testify made the 'the result of the trial unreliable or the proceeding fundamentally unfair.' See Lockhart, 113 S. Ct. at 844.") In his attempt to show prejudice, however, Washington is not relying on considerations--like the reliance on a state-court ruling that had been overturned (as did the defendant in Lockhart) or his lawyer's refusal to let him commit perjury (as did the defendant in Nix)--that would trigger the heightened prejudice standard of Lockhart. Washington is, instead, relying on Mr. Engle's failure to investigate, and an adequate investigation is surely a "right to which the law entitles him." Williams, 120 S. Ct. at 1513. Prejudice in Washington's case, therefore, should have been determined under the Strickland standard: did Washington show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[?]" Strickland, 466 U.S. at 694.

Williams confirms that Lockhart did not modify or supplant Strickland's prejudice test in a case such as this one, see Williams, 120 S. Ct. at 1513, but the Wisconsin Court of Appeals apparently believed that there was a "Lockhart" principle applicable here. In doing so, it analyzed Washington's ineffective-assistance claim under the wrong standard. This error in itself probably justifies granting Washington's application for a writ of habeas corpus under sec. 2254(d)(1). We are, however, likewise convinced that even if the Wisconsin Court of Appeals somehow silently applied the Strickland prejudice standard (without stating it or citing to it/9), its decision that Washington was not prejudiced by Mr. Engle's unprofessional errors

involved an unreasonable application of that standard.

The Wisconsin Court of Appeals rested its finding that Mr. Engle's failure to investigate Sharon and David Brown was harmless on, apparently, three grounds: (1) the untimeliness of Washington's disclosure, (2) the fact that a mid-trial adjournment would have likely been denied and (3) the belief that Sharon Brown's and David Brown's testimony would have been "cumulative" of Sandra Blue's and Jerome Pickens's testimony. See Washington, 1994 WL 51649, at *2-*3. The court also viewed Mr. Engle's failure to read the police report or to contact Leother Lobley as harmless because Washington had been identified by the two bar patrons and Lobley's testimony would have been cumulative. Therefore, the testimony would not have tended to diminish the possibility that Washington actually committed the crime. See id. at *2. Also, the Court of Appeals noted that if Lobley had testified, the State would have put Clifford Beasley on the stand and he would have contradicted Lobley's testimony about the shotguns. See id. But the Wisconsin Court of Appeals apparently did not consider the accumulation of these errors as it would affect Washington's likelihood of conviction.

The state's case against Washington was far from unassailable, and we know that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Strickland, 466 U.S. at 696. The tavern owner could not identify Washington, and there is some indication that he erroneously pointed to Washington when attempting to identify codefendant Johnson. James Davis identified Washington at trial, but his recollection may be suspect because he remembered only two suspects being presented by the police on the day of the crime. Jane Dornuff also purportedly identified Washington, and claimed that he was the man carrying the shotgun. But at the preliminary hearing, she could not recall whether Johnson was carrying the handgun or the shotgun, and she may have told the police that she was positive Johnson carried the shotgun. Further, the prosecution linked Washington to the robbery by adamantly arguing that the shotguns were his and that he had used them in the robbery. Lobley, if called, would have testified that the guns found in the automobile belonged to Shorty G. This testimony would have undercut the impact of this solitary physical evidence.

If the case Mr. Engle presented was Washington's best case, the conviction would have

stood on solid ground. But Washington's defense was crippled. He testified, but only with necessarily weak corroboration from Blue--who had no direct knowledge of Washington's whereabouts after noon on the day of the robbery. Unlike Blue, Gola Richardson, Sharon Brown, David Brown and Jerome Pickens were with Washington at 24th and Vine at about the time the Jolly Skot was robbed. Jerome Pickens was the only one of these to testify, corroborating Washington's story, but Pickens's credibility was impaired because of his prior convictions. The impact of three more witnesses corroborating Washington's alibi would not have been "cumulative" as the Wisconsin Court of Appeals believed./10 Evidence is cumulative when it "supports a fact established by existing evidence," Black's Law Dictionary 577 (7th ed. 1999), but Washington's whereabouts on the day of the robbery was far from established--it was the issue in the case. The fact that Pickens had already testified to facts consistent with Washington's alibi did not render additional testimony cumulative. Indeed, the additional testimony of Gola Richardson, Sharon Brown and David Brown--none of whom could have been impeached as having a criminal record--would have added a great deal of substance and credibility to Washington's alibi. See Montgomery v. Petersen, 846 F.2d 407, 411-15 (7th Cir. 1987) (finding counsel ineffective for not calling additional disinterested alibi witnesses not subject to the same impeachment as family members); Crisp v. Duckworth, 743 F.2d 580, 585 (7th Cir. 1984) (finding that "[h]aving independent witnesses corroborate a defendant's story may be essential" and "testimony of additional witnesses cannot automatically be categorized as cumulative"). Rather than one direct alibi witness with a criminal record, Washington could have had three potentially more credible witnesses, all of whom would have supported his claim that he was at Gola Richardson's when the Jolly Skot was robbed. Plus, the jury surely wondered where these people were, especially Ms. Richardson who had been named on Washington's notice of alibi and who Mr. Engle specifically mentioned at least at voir dire. There was a negative inference against Washington based on their absence. See Harris v. Reed, 894 F.2d 871, 879 (7th Cir. 1990) (holding that counsel's failure to produce witnesses referred to in opening statement was prejudicial). Given the absence of these witnesses, the jury had good reason to find Washington's alibi dubious.

Also, if Mr. Engle had read Detective Hudlet's report, he would have known both to cross-examine the reporting officer and to produce Leother Lobley as a witness. Not only would Lobley have

corroborated Washington's alibi by confirming that he picked Washington up at 24th and Vine at about 5:45, but his testimony also would have distanced Washington from the shotguns by explaining that Shorty G. put the guns in the car and that Washington knew nothing about them. The shotguns were the State's only physical evidence linking Washington to the robbery, and they were a key part of the State's case against him. At trial, only Washington testified that the shotguns were not his, so Lobley's testimony to the same effect could have helped a great deal. The Wisconsin Court of Appeals believed that, because Lobley's testimony could have been contradicted by Clifford Beasley--Beasley had told the police that the shotguns were Washington's--Lobley's absence was not prejudicial. But, the mere fact that some negative evidence would have come in with the positive does not eliminate the prejudicial effect of leaving corroborative evidence unintroduced.

Evaluated individually, these errors may or may not have been prejudicial to Washington, but we must assess "the totality of the omitted evidence" under Strickland rather than the individual errors. See Williams, 120 S. Ct. at 1515. Considering the "totality of the evidence before the . . . jury," Strickland, 466 U.S. at 695, Engle's unprofessional errors were prejudicial to Washington. Engle did not just botch up one witness or one argument or one issue--he repeatedly demonstrated a lack of diligence required for a vigorous defense. Engle's performance "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. All Washington needed to do was establish a reasonable doubt, and having additional, credible alibi witnesses would have covered a lot of ground toward that goal. The Wisconsin Court of Appeals looked at the mass of evidence that Washington could have produced but for Mr. Engle's errors, and it unreasonably concluded that its absence did not cause prejudice. Although questions of this kind do not lend themselves to the mathematical certainty of an acquittal, the proper application of Strickland should have left the Wisconsin Court of Appeals with the belief that acquittal was reasonably probable if the jury had heard all of Washington's evidence. Therefore, we find that-- in addition to being "contrary to" Strickland-- the decision of the Wisconsin Court of Appeals "involved an unreasonable application of" Strickland's prejudice component to the facts of this case.

III. Conclusion

   Accordingly, the judgment of the district court
to grant Washington's application for a writ of
habeas corpus under sec. 2254(d)(1) is Affirmed.
The State shall retry Washington within 120 days,
or failing that, Washington is entitled to be
released.


/1 James L. Johnson was Washington's codefendant, so
to avoid any confusion between the bar owner and
the codefendant, this opinion will refer to James
D. Johnson simply as "the bar owner" and will
refer to James L. Johnson as "codefendant
Johnson" or just "Johnson."

/2 Johnson had been apprehended on July 17, 1990.
When the police searched him, they found a .25
caliber handgun, .25 caliber shells and Jane
Dornuff's Wisconsin driver's license and
identification card.

/3 Mr. Engle did cross-examine a police officer
about the lineup at the police station, of which
Washington was not a member. But he never clearly
impeached the bar owner. Nonetheless, Washington
does not pursue this issue here.

/4 Sharon Brown is occasionally referred to as
"Sharon Richardson" in some transcripts and
materials. This is not an important detail, so we
will just refer to her as "Sharon Brown."

/5 We think it safe to assume that there is no such
thing as a correct, yet unreasonable, application
of federal law.

/6 Washington disputed this, claiming that he gave
this list of witnesses to Engle well before
trial. However, we need not address this
disparity because we would reach the same
conclusion under either version of the facts.

/7 As mentioned before, this list included
Washington's former counsel (who had been
replaced by Mr. Engle), Gola Richardson, Sharon
Brown, David Brown, Jerome Pickens, Sandra Blue
and Leother Lobley, as well as others not
relevant here.

/8 There was at least one sizable break in the
trial. The trial did not begin on the third day,
Wednesday June 12, until 2:00 in the afternoon.
(The attorneys and the court had agreed the
previous day to delay the beginning on Wednesday
so that Ms. Heard, the prosecutor in the case,
could attend her son's graduation from
kindergarten. See Ex. Q at 23-24.) Mr. Engle did
not attempt to speak with his client on that free

Wednesday morning.

/9 The Wisconsin Court of Appeals did make one brief mention of "the two-part Strickland test," see Washington, 1994 WL 51649, at *2, but this reference was made more in passing than as a citation to a legal standard or to authority. For each of its prejudice rulings, the court clearly cited Lockhart, and only Lockhart, as authority.

/10 Neither Sharon Brown nor Leother Lobley testified at the post-conviction hearing, but, by finding that their testimony would have been cumulative, the Wisconsin Court of Appeals assumed that their testimony would have been consistent with Washington's alibi. We do too.