# In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 05-2929

JOSEPH ECKSTEIN,

*Petitioner-Appellant,*

v.

PHIL KINGSTON,[1]

*Respondent-Appellee.*

---

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 03-C-0885—**William E. Callahan, Jr.**, *Magistrate Judge.*

---

ARGUED JANUARY 6, 2006—DECIDED AUGUST 16, 2006

---

Before EASTERBROOK, MANION, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Joseph Eckstein solicited a woman to murder his wife, and he taped two of the conversations in which he did so. As did the police. Unsurprisingly, after a bench trial in Brown County Circuit Court in Wisconsin, Eckstein was convicted of conspiracy to commit first-degree homicide and solicitation to commit first-degree homicide. He was sentenced to 40 years in prison on the conspiracy

---

[1] The caption in this case has been amended to reflect that Eckstein's current custodian is Phil Kingston, the warden of the Waupun Correctional Institution. Rules Governing § 2254 Cases, Rule 2(a); FED. R. APP. P. 43.

charge and to 10 years for the solicitation charge, to be served concurrently.

In a federal habeas corpus petition, Eckstein is now trying to convince us that the Wisconsin Court of Appeals was unreasonable in its determination that he did not receive constitutionally ineffective assistance of counsel, as defined by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). Because the Wisconsin Court of Appeals' decision was reasonable (maybe even inevitable), we affirm the magistrate judge's judgment dismissing Eckstein's petition.

**I**

Eckstein was convicted of conspiring to kill his wife, Annamaria, who had filed for divorce, and soliciting a woman named Crystal Graham to do the dirty work. Unfortunately for Eckstein, though thankfully for Annamaria, Graham lost her nerve and decided to cooperate with the police. Even more unfortunate for Eckstein was the fact that both he and the police, using a wire with Graham's consent, taped the final two planning conversations between Eckstein and Graham. Eckstein was arrested after the second taped meeting on September 3, 1998; his own tape of the two conversations was seized from his truck later that day.

During Eckstein's trial, Graham was the key witness. According to Graham, she met with Eckstein several times in the spring and summer of 1998 for the purpose of arranging for her to kill his wife. She testified that the subject first arose in April 1998 when Eckstein told her that "he wished he knew someone who could get rid of" his wife or "bump her off." Graham responded that her son could find someone to do it. At their second meeting, they negotiated a price of $10,000. Eckstein also provided Graham with information about his wife, including the type of car

she drove. At their third meeting, Eckstein told Graham that he wanted his wife "bumped off" while he was out of town for a wedding, but Graham told Eckstein that they were going to plant drugs on Annamaria and send her to prison rather than kill her because Graham's son deemed the latter plan too risky. In preparation, Eckstein gave Graham keys to Annamaria's car, a business card with her photograph, and information about her, including her work and home addresses and the identities of her friends. He also gave Graham $1,000 to procure the necessary drugs; the plan foundered, however, when Graham could not obtain the drugs. At that point, she returned the $1,000 as well as Annamaria's car keys to Eckstein. Graham left town for a month, but when she returned she talked again with Eckstein and indicated she was still on board with the plan to "get rid of" Annamaria. In fact, this was not true. On August 31, 1998, Graham went to the police, told them about the plan, and agreed to wear a wire at her next meeting with Eckstein.

When the two met again on September 2, 1998, both the police and Eckstein taped the encounter. Eckstein told Graham that he "would need a[n] exact plan and time first . . . because . . . the last time I don't feel you had a plan." Graham suggested using a Molotov cocktail, as Eckstein had suggested at an earlier meeting, but Eckstein was concerned about her lack of experience. Graham responded, "Well i[f] I lose my life, I lose it," to which Eckstein replied:

> No, no, no. There's a chance of . . . the bottle not hitting hard enough, not breaking or whatever. . . . Of course[,] there's other things to do. . . . [Y]ou know the other thing is what that one lady does with that cleaner, oven cleaner. I mean, if somebody I think got that all over their body and in their mouth and in their lungs or knocked out and . . . virtually I mean sprayed their mouth and lungs full of that as well as the whole body . . . I think they're gonna be gone.

When Graham responded that she would do whatever Eckstein wanted, he replied, "[I]t's up to you. . . . [W]hat I want to do is know nothing about it. . . . And I want to be gone." Eckstein repeated that he could pay $500 immediately, $500 immediately after the "job," and $10,000 as soon as he was cleared. He worried that he would be blamed and then repeated,

> I wanna be gone so if somebody asks me if I know, I might say something that would, ya know, conflict or affect you . . . . Cause if, ya know, I know you're gonna shoot her, I might goof up. . . . [I]f they question me about the shooting, question you about the shooting, ah, we're not gonna say the same thing. . . . If I don't know anything about something and something happens and I'm gone someplace else, I have an alibi.

Eckstein also expressed concern that the last plan he and Graham had made had failed, and then he asked how and when Graham would act. Graham indicated that she "plan[ned] on doing it hopefully this weekend if it looks good." Later, Graham said she "can hit her one way or the other," and Eckstein responded, "one of the best ways, ya know if I was gonna do it, I'd go for her garage." At the same meeting, in addition to suggesting the use of oven cleaner, Eckstein also indicated by hand gestures that Graham should slash Annamaria's throat or stab her in the stomach. The two agreed that the event would occur the next weekend while Eckstein was out of town.

The next day, on September 3, 1998, the two met again, and again both Eckstein and the police recorded their conversation. Eckstein gave Graham $500, a business card with Annamaria's photo, keys to her car, and information about where to find her. According to the transcript of the police tape, Eckstein said,

> You do this right, ya know, like say in the garage or something. Ya know, murder her in the garage or do it

in the garage or something. Load her in the car. Bury her in the cornfield or something . . . between the rows of corn. Nobody will ever know it.

Eckstein then suggested that Graham should steal Annamaria's car and alter the VIN number to disguise the theft, before continuing, "Put the person in the car, take the car and the person, get rid of the person, get rid of the license plate." Once again, Eckstein reassured Graham that he didn't "care what you wanna do [to] keep track of me, be with me all the time or whatever you want to do . . . [until] the smoke clears and then you get the ten grand." Eckstein then told Graham that he wanted "a guarantee" that the job would be done by October 15. Graham responded, "You'll either get the money or you'll get the job and . . . I'm planning on killing Annamaria this weekend." Eckstein signed off with a "Yeah. Okay."

At trial, the prosecution played the police recording of the September 2, 1998, conversation and submitted a transcript of it. The September 3, 1998, conversation was handled differently. Unaware that he had been successful at recording the September 3, 1998, conversation, Eckstein initially planned to attempt to keep the police recording out on the grounds of poor quality, thereby eliminating any record of that conversation. But when the police discovered Eckstein's recording of the September 3, 1998, conversation on the flip side of the tape from the day before, Eckstein waived his objection because he believed that his recording would be admitted anyway. In the end, the court admitted both recordings for that day, but only Eckstein's was played at trial. The transcript for September 3 that was admitted, however, was from the police recording, which Eckstein now claims inaccurately reflects his use of the word "murder." The magistrate judge presiding over the habeas corpus proceeding rejected Eckstein's motion seeking to supplement the record in the district court with the tapes themselves.

Eckstein testified at trial and offered an account of the events that was different, although not entirely exculpatory. He stated that it was Graham who initially came up with the idea of "tak[ing] care" of his problems with Annamaria, that Graham suggested three options—plant drugs on Annamaria, take her out of the country, or kill her—and that he only agreed to pay $10,000 to plant drugs. Eckstein admitted paying Graham $1,000 to obtain the drugs and demanding the money's return when the plan stalled. The next time Graham told him that she was "working on a plan for Annamaria," Eckstein testified, he did not believe her because he "knew better from all the experience and the stories [he] heard before." He testified that he called Graham then because he wanted her to serve as a witness in his divorce, and that he taped their conversations to protect himself because he thought Graham was acting strangely. Eckstein claimed that he believed that Graham was still talking about a plan to plant drugs on Annamaria. He nixed the Molotov cocktail idea, he said, because he did not want Annamaria to get hurt. It was Graham, not he, who had first suggested oven cleaner at an earlier (unrecorded) meeting as a means of self-protection. He testified that he was just being agreeable when he said "Yeah. Okay." to her statement about killing Annamaria that weekend because "[w]hatever she would say, I wouldn't believe anyway." He also testified that it was his understanding that references to "hurting" or "getting rid of" Annamaria involved planting drugs on her, not killing her, and that he knew that Graham was mentally unstable and incapable of killing Annamaria.

The judge did not buy Eckstein's story and found him guilty. Following his conviction, he engaged in two full rounds of appeals and post-conviction review in the state courts. In the second, he raised the same two arguments he now pursues—that his counsel was ineffective for failing to suppress the recording of his September 3, 1998, meeting with Graham and for failing to use Graham's mental illness

to discredit her. The circuit court and Wisconsin Court of Appeals both rejected these arguments, and the Wisconsin Supreme Court denied review. Eckstein filed a petition for habeas corpus in federal court, and the parties consented to jurisdiction before a magistrate judge pursuant to 28 U.S.C. § 636(c). The district court found that the state court had not applied federal law unreasonably, but it granted a certificate of appealability (COA) on the question whether Eckstein was denied effective assistance of counsel either through the failure to cross-examine Graham on her mental state or the failure to seek suppression of Eckstein's tape of the September 3, 1998, conversation.

## II

Our review in this case is constrained by the Antiterrorism and Effective Death Penalty Act (AEDPA), which provides that habeas corpus relief may not be granted unless the state court proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1); see *Brown v. Payton*, 544 U.S. 133, 141 (2005). It is not enough for the state court to be wrong or incorrect; the state court must be unreasonable. See *Danks v. Davis*, 355 F.3d 1005, 1008 (7th Cir. 2004). We review the district court's legal conclusions *de novo* and its factual findings for clear error. See *Charlton v. Davis*, 439 F.3d 369, 372 (7th Cir. 2006).

The legal rules governing Eckstein's claim that his trial counsel was ineffective were established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must show that her counsel's performance was objectively unreasonable or deficient and that she was prejudiced as a result. *Id.* at 687. "[T]here is a strong presumption that [an] attorney performed effectively." *Berkey v. United States*, 318 F.3d 768, 772 (7th Cir. 2003).

Furthermore, "[t]he reasonableness of counsel's perfor-mance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circum-stances." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). Even if counsel's performance was deficient, a petitioner must also show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," meaning "a probabil-ity sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "In weighing the effect of counsel's errors, the court must consider the totality of the evidence before the judge. . . . [A] verdict or conclusion that is overwhelmingly supported by the record is less likely to have been affected by errors than one that is only weakly supported by the record." *Hough v. Anderson*, 272 F.3d 878, 891 (7th Cir. 2001).

Eckstein complains about two aspects of his lawyer's performance, which we review below. It is important to recall, however, that it is not enough to criticize counsel for failing to take particular steps. Instead, one must also address what action counsel did take, and then evaluate her performance as a whole. See *U.S. ex rel. Hampton v. Leibach*, 347 F.3d 219, 248 n.14 (7th Cir. 2003). With that in mind, we turn to Eckstein's first point: that counsel was ineffective for failing to pursue and use available evidence of Graham's mental illness to impeach her. No one familiar with her mental state, he asserts, would believe that Eckstein intended to hire Graham to kill his wife.

A fair amount of evidence about Graham's mental state emerged, both during pretrial proceedings and at trial. During cross-examination at a preliminary hearing, Graham admitted that she was "very low, very depressed." Her father was terminally ill, her daughter and grandchild had moved to California, her son was in prison, and she had financial problems. Graham testified that she was under a doctor's care for manic depression and post-traumatic stress

syndrome, and that in September 1998 she was taking medications including Prozac and lithium. She admitted that she had "difficulty remembering things in stressful situations." At trial, Graham repeated some of this information, disclosing that she suffered from clinical depression and had been medicated for that condition for a decade and that her son was in a mental hospital. Eckstein's lawyer did not use any of this evidence to cross-examine Graham at trial; instead, he tailored his cross-examination to showcase the holes in Graham's memory as they related to earlier non-taped conversations and to corroborate Eckstein's account of events. In essence, the trial counsel chose to use Graham's lack of credibility to attempt to defeat the finding of an agreement necessary for the conspiracy charge, rather than to suggest that Eckstein lacked intent because he knew that she would not follow through.

At the post-conviction hearing, Eckstein's counsel indicated that he had reviewed the preliminary hearing transcript and was aware of Graham's mental health problems, but that he chose not to focus on them because of the tapes that corroborated Graham's account. Inquiries about her mental stability, he concluded, would not have made a difference. In evaluating the record, the Wisconsin Court of Appeals concluded that this decision was a strategic one that it saw no reason to second-guess. It is apparent that the court knew that the governing Supreme Court precedent was *Strickland*, and therefore we evaluate only whether the state court applied *Strickland* unreasonably. This occurs when the state court application of the established federal law yields a conclusion "lying well outside the boundaries of permissible differences of opinions." *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002). We see no need to belabor the point here. It would have been pointless for counsel to harp on Graham's mental problems when her testimony was entirely corroborated by the tapes that Eckstein himself and the police had made. Our review

of counsel's performance as a whole shows that he did a thorough job of raising serious doubts about her credibility.

Furthermore, even if the trial counsel's failure to impeach Graham with evidence of her mental illness amounted to deficient performance, it is plain that there was no prejudice. The trial court emphasized that the tapes erased whatever doubt might have lingered because of the inherent strangeness of the situation, commenting that "I concluded that [Graham's testimony] is true because of the clear and overwhelming evidence corroborating it, both in the forms of the physical evidence that w[as] retrieved, as well as the tape recordings of the conversations that form the basis of the charges." The Wisconsin Court of Appeals added that there was no prejudice because "[a]dditional testimony regarding her psychological problems would [ ] not likely have led the court to reach a different conclusion." It based that conclusion both on the damning recordings and on Graham's testimony on direct examination that she suffered from clinical depression, took medication, and could not remember some conversations due to stress. That testimony left no doubt that the trial court was well aware of Graham's mental illness; it was also aware, thanks to the cross-examination of trial counsel, of the holes in her memory and her testimony.

Eckstein finally suggests that there is a reasonable probability that a fuller exploration of Graham's mental state would have changed the outcome because it would have demonstrated that he was never serious about killing his wife precisely because he knew that Graham could not and would not murder Annamaria. This argument is speculative at best; it is certainly not one that the state court was compelled to adopt. In fact, there is a real risk that the trial court might have looked at Graham's mental instability in the opposite way and concluded that Eckstein had found someone mentally unstable enough to commit murder for an acquaintance for $10,000. Intent is almost

always demonstrated by circumstantial evidence. Here, the state courts were aware of Graham's mental illness, of the lunacy of this particular plan, and of Eckstein's own testimony that he agreed because he knew Graham would not carry out the job. The Wisconsin Court of Appeals easily met AEDPA's reasonableness standard when it concluded that more evidence about Graham's mental state would not have created a reasonable probability of a different verdict.

Eckstein's second complaint about counsel targets the attorney's failure to seek suppression of Eckstein's own tape of the September 3, 1998, conversation. The state trial court agreed with Eckstein that his counsel's performance in failing to seek suppression and exclusion of Eckstein's tape had been deficient, but it held that there was no prejudice. The Wisconsin Court of Appeals followed suit by refusing to address the legality of the police's search and instead basing its denial of relief on the lack of prejudice. *Strickland* approves of this approach, see 466 U.S. at 697, and thus we too turn immediately to the question of prejudice.

Eckstein contends that the Wisconsin Court of Appeals applied the wrong test for prejudice, and thus, as § 2254(d)(1) puts it, applied law "contrary to" *Strickland*. In its paraphrase of the *Strickland* standard, the Court of Appeals stated, "To satisfy the prejudice prong, the defendant must show that counsel's errors were serious enough to render the resulting conviction unreliable." In analyzing prejudice, the Court of Appeals again said, "We conclude that Eckstein was not prejudiced because there is no evidence the conviction was unreliable." This use of the wrong standard is contrary to *Strickland*, Eckstein argues, relying on *Washington v. Smith*, 219 F.3d 620, 632-33 (7th Cir. 2000), in which the state court applied a standard of prejudice articulated by the Supreme Court in *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993), that looks beyond outcome determination to the fundamental fairness of the proceeding. The *Fretwell* standard applies only in the

"unusual circumstance where the defendant attempts to demonstrate prejudice based on considerations that, as a matter of law, ought not inform the inquiry," such as where the state court decision had been overturned. *Id.* at 373 (O'Connor, J., concurring). In *Washington*, where the ineffective assistance was the failure to investigate, the *Fretwell* standard was inappropriate because no such unusual circumstance was present. 219 F.3d at 632. Although this court concluded that the state court had applied the wrong legal test "contrary to" *Strickland*, we went on to ask whether the state court had silently applied the correct *Strickland* standard. *Id.* at 633. On that alternate ground, we found that the state court's decision was unreasonable. *Id.*

The Wisconsin Court of Appeals did not make the same mistake in this case. Unlike the situation in *Washington*, the state court's explanation of the prejudice standard cites *Strickland* and is not "contrary to" it. The court's conclusion reflects the proper inquiry, where it says that "[a]dditional testimony . . . would therefore not likely have led the court to reach a different conclusion." The court's occasional references to reliability do not undermine its holding. *Strickland* itself states that to show prejudice one must demonstrate "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." See 466 U.S. at 687. Furthermore, what is important is that the overall reasoning is consistent with *Strickland*. See *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) ("[A] state court need not even be aware of [Supreme Court] precedents, so long as neither the reasoning nor the result of the state-court decision contradicts them.") (internal quotation marks omitted). See also *Floyd v. Hanks*, 364 F.3d 847, 852-53 (7th Cir. 2004) (concluding that the state court properly considered and applied the *Strickland* prejudice test, despite a reference to "reliability" as used in *Fretwell*). The Wisconsin Court of Appeals' decision satisfied these standards.

Even if the state court had articulated the wrong prejudice standard in this case, its error would have been harmless, because a re-evaluation under the correct standard would lead to the same conclusion. See *Winters v. Miller*, 274 F.3d 1161, 1167-68 (7th Cir. 2001) (concluding that the state court's erroneous application of *Fretwell* did not require reversal of conviction because *de novo* review under the *Strickland* standard rendered the same result). There simply was no "reasonable probability of a different result."

The final point Eckstein raises is a procedural one about the district court's handling of his request to expand the record to include the two tapes made on September 3, 1998. In essence, he is asserting that the district court's procedural ruling refusing to admit the tapes led to his inability to demonstrate the alleged constitutional flaw in the state court proceedings. See 28 U.S.C. § 2253(c)(2). See *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000) (holding that where a habeas corpus petition is dismissed on procedural grounds a petitioner must show both a substantial showing of a constitutional right and that reasonable minds disagree about the procedural decision). Although this issue is not identified in the COA, it is the type of preliminary procedural matter *Slack* had in mind, and both parties have briefed it without comment. We thus discuss it briefly.

Eckstein complains that the district court's decision prevented him from proving that he was prejudiced by counsel's failure to ask the court to suppress the September 3, 1998, recording. A comparison of the recording and the police transcript would have shown, he thinks, that he never used the word "murder." Rule 7(a) of the Rules Governing Section 2254 Cases provides that "the judge may direct that the record be expanded by the parties by the inclusion of additional materials relevant to the determination of the merits of the petition." We review the decision not to expand the record for an abuse of discretion. See

*Anderson v. Attorney General of Kansas*, 425 F.3d 853, 858 (10th Cir. 2005). In this case, although the court expanded the record in some respects, it declined to admit the recordings, noting the limited scope of habeas corpus review and that the transcripts of both police recordings were in the record. The magistrate judge indicated that he did not see how listening to the tapes themselves would be relevant to the issues in the case because whether the state court's decision was unreasonable did not turn on the exact content of the tapes.

Although it might have been prudent to accept the tapes, we conclude nevertheless that the district court did not abuse its discretion. Even if we assume that Eckstein is correct that he never utters the word "murder" on the tape, there are so many other references to the planned killing of Annamaria that this alleged inaccuracy is irrelevant. There is no dispute, after all, about the September 2, 1998, conversation, in which Eckstein rejected the Molotov cocktail idea and suggested in its place the use of oven cleaner. Later in that same conversation Eckstein talks about his need for an alibi. Even if there had been no conversation the next day, this September 2, 1998, taped conversation likely would be sufficient to uphold the conviction, particularly when combined with Graham's testimony. In addition, the police obtained from Graham the $500 deposit that Eckstein paid her the next day, as well as the identification card and other materials he provided. Finally, without Eckstein's September 3, 1998, tape in the record, we still have the police tape—although it is not as comprehensive—and the transcript of it. Nothing in either the September 2 tapes or the police version of the September 3 conversation makes Eckstein's story of a conspiracy to plant drugs plausible. After all, he was suggesting that Graham bury his wife in a corn field and steal her car. Finally, and Eckstein does not dispute the accuracy of these words, he responded "Yeah. Okay." to Graham's statement that she was planning to kill his wife that weekend.

In his brief, Eckstein suggests that the fact that "[o]nly two references in the state's tape, as reflected in the 'transcript' of that tape, suggest that the plan is to kill Annamaria rather than to plant drugs" somehow absolves the transcript and/or the police's own tape of its damning quality. We are not sure why or how the word "only" can be linked with the number "two" here: how many references to murder does Eckstein think should be necessary to convict? Our own conclusion is that the alleged error Eckstein has identified had no chance of affecting the outcome.

## III

Evaluating counsel's performance as a whole, as we must, and giving proper deference to the district court's handling of the habeas corpus proceeding, we find no reason to disturb Eckstein's conviction. We therefore AFFIRM the district court's denial of his petition for a writ of habeas corpus.

A true Copy:

      Teste:

 

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*