**Brian Keith FARGO, Petitioner,**

v.

**Thomas PHILLIPS, Warden, Respondent.**

No. CIV.A. 99–CV–71507–DT.

United States District Court, E.D. Michigan, Southern Division.

Feb. 6, 2001.

Desiree M. Ferguson, F. Martin Tieber, State Appellate Defender Office, Lansing, MI, for Petitioner.

Vincent J. Leone, Michigan Department of Attorney General, Habeas Corpus Division, Lansing MI, for Respondent.

### *ORDER CONDITIONALLY GRANTING HABEAS CORPUS PETITION* [1]

TARNOW, District Judge.

I. Introduction ................................................................1077

II. Background ................................................................1077
 A. Fargo on Trial ......................................................1077
 B. The Evidentiary Hearing ............................................1079
 C. State–Court Rulings ................................................1082

III. Analysis ..................................................................1084

**1.** Staff Attorney Martin Cadwell provided quality research assistance.

A. The AEDPA Standard of Review ........................................ 1084
B. Ineffective Assistance of Counsel Claims and Strickland v. Washington ....... 1085
C. Defense Counsel's Performance ...................................... 1087
D. Prejudice to Fargo ............................................... 1093

IV. Conclusion ........................................................ 1096

## I. Introduction

Petitioner, Brian Keith Fargo ("Fargo" or "Petitioner"), presently confined at the Egeler Correctional Facility in Jackson, Michigan, has filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 through counsel alleging that he is confined in violation of his constitutional rights. In his application, Petitioner challenges his conviction after a jury trial of third degree criminal sexual conduct, M.C.L. § 750.520d. Petitioner pleaded guilty to being a habitual offender and was sentenced to fifteen to thirty years imprisonment. M.C.L. § 769.12.[2] After his conviction, Fargo appealed, raising three issues, including the two set forth in the present petition. Fargo made a timely motion for a new trial and for an evidentiary hearing in the trial court, known in Michigan as a Ginther hearing[3], claiming that he was denied the effective assistance of counsel at trial. Fargo asserted that trial counsel was ineffective for failing to adequately investigate, prepare, and present an alibi defense. Following the evidentiary hearing, the trial court denied the motion. The Michigan Court of Appeals affirmed Fargo's conviction and sentence in an unpublished opinion.[4] The Michigan Supreme Court denied Fargo's application for leave to appeal.[5]

On or about March 30, 1999, Fargo filed an application for a writ of habeas corpus under 28 U.S.C. § 2254 in this Court, again arguing ineffective assistance of trial counsel.[6] Respondent answered the petition on or about September 1, 1999, asserting that the petition should be denied. Oral argument was held in this Court on June 28, 2000. Petitioner and Respondent subsequently filed supplemental briefs for the Court's consideration. For the reasons set forth below, the petition shall be conditionally granted.

## II. Background

### A. Fargo on Trial

Petitioner was accused and found guilty of engaging in sexual penetration with Sheila Ruggero on April 23, 1992, at about 9:30 or 10:00 p.m. On that date, Fargo was twenty-six years old and Sheila Ruggero ("Ruggero") was fifteen years old.[7]

2. Petitioner's three prior felonies were 1) breaking and entering an unoccupied dwelling, M.C.L. § 750.110; 2) joyriding, M.C.L. § 750.414; and 3) unlawful driving away a motor vehicle, M.C.L. § 750.413. As a fourth felony habitual offender, Petitioner's maximum sentence exposure was life imprisonment upon conviction of the underlying offense of third degree criminal sexual conduct which has a fifteen year maximum prison sentence upon first offense. M.C.L. § 750.520d(2); M.C.L. § 769.12(1)(a).

3. People v. Ginther, 390 Mich. 436, 212 N.W.2d 922 (1973).

4. People v. Fargo, Michigan Court of Appeals Docket No. 158594 (February 10, 1997).

5. People v. Fargo, 457 Mich. 855, 581 N.W.2d 727 (1998). Two justices would have granted leave to appeal. Id.

6. The petition also challenges Fargo's sentence as being based in part on improper prosecutorial argument or innuendo, not supported by evidence, that Fargo was an alcohol or substance abuser.

7. In Michigan, a person is guilty of third degree criminal sexual conduct if that person engages in sexual penetration with another person who is at least thirteen years of age and less than sixteen years of age. M.C.L. § 750.520d(1)(a). Third degree criminal sexual conduct is also committed when a person engages in sexual penetration with another person and force or coercion is used to accomplish the sexual penetration. M.C.L. § 750.520d(1)(b).

Ruggero testified that she met Fargo about two years before the incident and had seen him every day for about two or three weeks before the incident. Fargo would pick her up after school and they would drive around in his car, sometimes stopping at a park near Lake Michigan. Ruggero testified that she and Fargo french kissed on one of these occasions during a visit to Copyeon Park about a week before the incident. Ruggero further testified that Fargo also touched her breasts and put his finger in her vagina at that time and asked her to have sex with him. She declined and he got mad.

Ruggero testified that Fargo wrote her letters in which apologized for his behavior at Copyeon Park, stated that he was not mad at her, and told her she was beautiful and had a "nice bod." Fargo expressed similar sentiments to her in person.[8] Ruggero considered herself and Fargo girlfriend and boyfriend.

Ruggero further testified that, about a week after their last visit to Copyeon Park, on April 23, 1992, Fargo picked her up in his car at about 9:00 p.m. and told her that he wanted to go home to change clothes. She went inside with him. Once inside, Fargo persuaded her to watch television with him. Ruggero further testified that, while watching television on the couch, Fargo started touching her breasts, putting his finger in her vagina, pinning her down, and asking to have sex with him. Ruggero first said no. Eventually, she said yes. Then, on the way to the bedroom, she said no again. Ruggero testified that Fargo led her into the bedroom where they lay down on the bed. Ruggero testified that she continued to resist, telling Fargo, " 'I can't do this.' " Fargo started to take off her underwear, which she helped him do. Ruggero testified that Fargo then put his penis in her vagina and that it hurt. Ruggero testified that she asked Fargo to stop three or four times, but he would not do so. Ruggero further

testified that Fargo had difficulty putting his penis in her vagina and that it kept falling out, perhaps four or five times. Ruggero also was asked on direct examination if Fargo "successfully penetrated" her or not, to which she replied, "He didn't." However, she also testified immediately following this exchange that, whatever happened, it "hurt really bad." *Id.*

Ruggero testified that the sexual contact lasted a total of about five minutes. Ruggero stated that shortly thereafter she and Fargo got dressed, then Fargo gave her a hug and drove her to her friend Adeline Warner's sister's house.

Adeline Warner ("Warner"), a classmate of Ruggero's, testified that Sheila Ruggero arrived at her sister's house at about 10:30 p.m. that night. Ruggero was upset, shaky, and her voice was low. Ruggero told Warner that Fargo "had taken her to bed and she did not want to." Warner saw Fargo pick Ruggero up earlier that night. Warner had seen Fargo and Ruggero together on many occasions.

Detective Gary Castonia ("Castonia") of the Ludington police arrested Fargo. Castonia testified that Fargo denied having had sex with Ruggero. Castonia further testified that, when he told Fargo of the complaint filed by Sheila Ruggero, Fargo first stated·that he did not know any Sheila. On cross-examination, Castonia admitted that Fargo also said he knew a lot of Sheilas. On redirect, Castonia said that Fargo claimed that he did not know who Sheila Ruggero was, despite Castonia's attempts to identify her as a fifteen year old Ludington high school student with whom he had been seen driving around in his car and accompanying around town on other occasions.

No physical evidence was presented showing that Fargo had sex with Ruggero. Evidence was presented that Ruggero was examined by a doctor three days after she claimed Fargo penetrated her sexually.

---

**8.** Several of Fargo's letters to Ruggero were admitted in evidence. The prosecutor quoted one of the letters as saying: "You're a sweet-

heart and you're hot. I can't wait until I see you again. I'm dreaming of you."

The doctor testified that he was unable to determine whether Ruggero's vagina had ever been penetrated by a finger or a penis.

Fargo did not testify at trial.[9] The defense presented no other witnesses or evidence.

Defense counsel was allowed to present an opening statement after the prosecution rested. In his brief opening statement, defense counsel reminded the jury that the fact that Fargo was charged did not mean he was guilty and asserted that Fargo maintained his innocence. Defense counsel then announced that, on advice of counsel, Fargo would not take the stand and the defense would not be presenting any witnesses.

Defense counsel's final argument consisted of four one or two sentence paragraphs. Defense counsel asserted that 1) Fargo "couldn't deny more vehemently that he did this, because if he was willing to admit anything and be a part, it would have been resolved long ago[,]" 2) Fargo's "conference with Officer Castonia came down to the fact that I have had no sex with Sheila," 3) there was no medical evidence that the complainant was sexually penetrated, and 4) asked the jury "to apply the facts in a meaningful way to the law of this state" and find Fargo innocent. Defense counsel did not present any theory of the case which attempted to explain why Ruggero might have accused Fargo of this crime, or how Fargo's apparent denial that he knew Sheila Ruggero might have an innocent explanation.

At the conclusion of the one-day trial, the jury found Fargo guilty as charged. Fargo pleaded guilty to being a fourth felony offender and the court sentenced him to fifteen to thirty years in prison. Appellate counsel filed a motion for a new trial and to remand for an evidentiary hearing on the ground that Fargo had

been denied the effective assistance of counsel. The Michigan Court of Appeals granted the motion to remand and an evidentiary hearing was held in the trial court on July 17, 1995.

**B. The Evidentiary Hearing**

Fargo contended at the evidentiary hearing that defense counsel rendered ineffective assistance of counsel by failing to adequately investigate, prepare, and present an available alibi defense.

The first witness at the *Ginther* hearing was Mary Quinn. Mary Quinn ("Quinn") testified that she had known Brian Fargo for about five years. She had worked with him and considered him a friend. On Thursday April 23, 1992, she went to the beach with her friend Gina Johnson ("Johnson"). They saw Brian Fargo there at about 6:00 p.m. Fargo invited them to his apartment. Quinn and Johnson drove in their vehicle the short distance to Fargo's apartment where they had a few drinks and stayed until about 9:30 or 10:00 p.m. This was the only time Quinn had ever been to Fargo's apartment. Quinn and Johnson left by themselves in their vehicle. Quinn later went to "college night" at the Tiki Bar. Quinn remembered that it was a Thursday, because that was college night at the Tiki. Quinn went to college night every Thursday. Quinn testified that she and Johnson would not have left Fargo's apartment much before 9:30 p.m., because "no one" arrived at the Tiki before 10:00 p.m. on college night.

Quinn spoke with Fargo on the telephone about a month after his arrest. Fargo asked her if she remembered having been with him on the night in question. Quinn told him that she did and that she was willing to testify about it. Quinn stated that she expected to be contacted about testifying by Fargo's attorney, but she never was. Quinn did not have a telephone at the time, but she had an address

---

9. Out of the presence of the jury, defense counsel stated on the record that he advised Fargo against testifying. Fargo stated on the record that he understood that he had the right to testify despite his attorney's advice.

Fargo did not comment when, after defense counsel and he conferred in the courtroom, defense counsel announced that Fargo would not be testifying.

and knew a friend of Fargo's named Dan Wilby who did have a phone.

On cross-examination, Quinn said that, a couple of years earlier she had told someone on the telephone that she had left Fargo's at about 9:30 or 10:00 p.m., so that must have been when she left.[10] Asked if she had an independent recollection of when she left Fargo's apartment, she replied "[n]ot really." However, when she was asked immediately thereafter if she could have left Fargo's apartment at 9:00 p.m., she replied that she could not have left that early, because she was going to the Tiki and she would not have left that soon to go there. When asked how she knew that she had been at Fargo's apartment on April 23rd and not some other Thursday in April of 1992, Quinn replied that three years before (at the time of the trial) she could have explained this, but could no longer do so.

Gina Johnson ("Johnson") testified that she had known Brian Fargo for about four years. Johnson met Fargo through Mary Quinn, her best friend for seventeen years. Johnson testified that she had been to Fargo's home once, on April 23, 1992, a Thursday. Johnson and Quinn saw Fargo at the beach at about 6:00 or 7:00 p.m. They went to Fargo's from the beach. They left Fargo's apartment between 9:00 and 10:00 p.m. Johnson "knew it was between 9:00 and 10:00, because it was not dark yet."

Johnson knew they went to Fargo's on a Thursday, because it was college night at the Tiki Bar and she and Quinn went there together later the same night. She and Quinn went to the Tiki for college night almost every Thursday. Johnson reiterated that It was not yet dark when she and Quinn left Fargo's. After leaving Fargo's, Johnson drove Quinn home. Johnson then went to her house to shower and change clothes before picking Quinn up and going to the Tiki. Johnson and Quinn arrived at the Tiki between 11:00 and 11:30 p.m. This also indicated that they had left Fargo's sometime between 9:00 and 10:00 p.m.

Johnson testified that she was certain she had been at Fargo's home on the 23rd of April. However, when asked what difference there was between April 16th or 30th and April 23rd at the Tiki Bar, she replied, "I guess there isn't." Johnson stated that she and Quinn and Dan Wilby had spoken about the fact that Fargo was accused of committing a crime on the evening she and Quinn had been with Fargo.

Johnson made an affidavit in which she stated that she visited Fargo at his home with Mary Quinn on April 23, 1992. However, Johnson crossed out the 23rd and initialed the cross-out. Asked why she did so, Johnson replied, "[b]ecause I cannot be absolutely without a doubt positive."

Johnson also testified that her sister's husband was a good friend of Sheila Ruggero's best friend's boyfriend. Gina Johnson's sister's name was Candy Johnson. Gina Johnson testified that Candy Johnson told her that Sheila Ruggero lied about her involvement with Fargo, because she did not want her boyfriend to get in trouble because Ruggero was pregnant.[11]

---

10. Quinn testified further that this telephone conversation took place after Fargo had been sentenced. It was not a conversation with Fargo's trial defense counsel. This call may have been part of an Attorney Grievance Commission investigation into a grievance Fargo filed against trial counsel.

11. The prosecutor objected to this line of questioning as irrelevant and as calling for improper admission of hearsay. The trial judge allowed the questioning and Gina Johnson's response without ruling on the prosecutor's objections. This testimony by Gina Johnson might not have been allowed at a trial as hearsay. Nonetheless, the factual allegations Gina Johnson made—that Sheila Ruggero had gotten pregnant by another boyfriend and that she lied about her involvement with Fargo to protect another boyfriend— could have provided useful information for the defense in developing a defense theory of the case and in developing its cross-examination of Sheila Ruggero, and possibly in searching for other potential defense witnesses. The prosecution may have objected to this inquiry as violating Michigan's rape shield law. However, case law indicates that rape shield laws "cannot be invoked to prevent a defendant from introducing evidence

Johnson testified that the only person she ever talked to about testifying for Fargo was Mary Quinn. Johnson was never contacted by Fargo's attorney by telephone or by letter.

Dan Wilby ("Wilby") testified that he was a friend of Brian Fargo.[12] Wilby testified that Fargo came to his house at about 9:30 or 10:00 p.m. on April 23, 1992. Wilby first stated simply that "[i]t was after dark." Later, Wilby testified that "it was just dark, like it turned dark not too long ago." Wilby and Fargo sat around and watched television during the visit. A few weeks later, Fargo called Wilby on the phone and asked him if he remembered that Fargo had visited him on April 23rd. Wilby testified that he knew that Fargo had been at his house on April 23rd and not April 16th or 30th because he had dozed off and began snoring and sleeping during the visit. It was not explained how this helped Wilby remember the date. Wilby did not speak to Fargo's attorney about these matters.

Brian Fargo testified that he was not with the complainant Sheila Ruggero on April 23, 1992, between the hours of 8:30 p.m. and 11:00 p.m., when she alleged that he had sex with her. Fargo testified that he saw Mary Quinn and Gina Johnson at the beach at about 7:00 p.m. He invited them to come and see his new apartment which was just a block off the beach on West Ludington Avenue. The three of them left the beach and went to his home. Quinn and Johnson were at his home with him having a few drinks, watching television, and talking until about 9:50 p.m. when the two women left. Fargo left his apartment at the same time and went to Dan Wilby's house. Fargo stayed there until about 11:05 or 11:10 p.m. He left then because he had to get up early the next

day. Fargo was able to recall that Quinn and Johnson had been to his home on the 23rd and he had been at Wilby's that day, because he was arrested just three or four days later. Because Fargo learned only a few days after April 23rd that he was accused of committing a crime on that day, he was able to think back and recall what he had done on that day.

Fargo testified that he told his trial attorney what he did on April 23, 1992, when counsel first visited him at the jail, about two weeks after his arrest. Fargo told his attorney what he had done during the evening in question and gave him the names of the three alibi witnesses. The next time counsel came to see him, Fargo gave him Quinn's address and phone number and described Gina Johnson as a friend of Quinn's who lived in Scottsville. Fargo did not know Gina Johnson's last name at that time. Fargo also gave counsel a notarized statement from Dan Wilby at that time.

Counsel assured Fargo that he was "get right on this," referring to checking on his alibi witnesses. However, counsel never informed Fargo that he had spoken with them.

Fargo wrote the trial court asking that a new attorney be appointed for him. The request was denied. Fargo wrote the Attorney Grievance Commission complaining that defense counsel was not doing his job and pressuring him to accept a plea bargain. Fargo notified the Commission about his alibi witnesses and the trial court's denial of his request for a new attorney.

Fargo acknowledged that, after he had been found guilty, he told the court that he was satisfied with defense counsel's representation. Fargo testified that, at that

that a prosecution witness had a motive to fabricate." *Stephens v. Miller*, 13 F.3d 998, 1013 (7th Cir.)(en banc)(Cudahy, J., dissenting)(collecting cases), *cert. denied*, 513 U.S. 808, 115 S.Ct. 57, 130 L.Ed.2d 15 (1994).

**12.** Petitioner states in his habeas petition that the person identified throughout the *Ginther*

hearing transcript as Dan Wilby is actually named Dan Willoughby. Petition at 6. However, because the *Ginther* hearing transcript refers to this witness as Dan Wilby, both in reference to his *Ginther* hearing testimony and in other witnesses' references to him, this Court shall refer to him as Dan Wilby.

point, he was scared and did not want to make any waves or trouble immediately before his sentencing.

Fargo admitted that, after being warned of his right to remain silent, he waived that right and answered some questions asked by the arresting officer, but did not tell the officer about his potential witnesses. Fargo also acknowledged that he did not address the trial court when it became evident that defense counsel would not present any alibi witnesses on his behalf. Explaining his inaction, Fargo noted that the trial court had already denied his request to be appointed a new attorney, that he had not completed the ninth grade, and was not a learned, scholarly person.

Defense counsel Henry Dongvillo ("Dongvillo") testified that he was appointed to represent Fargo and that Fargo had told him he had some alibi witnesses. Dongvillo said Fargo had at least two alibi witnesses. Dongvillo further testified that his best recollection was that he had talked "at least one or more, and my recollection, the one was a male and one was a female." He could not remember the names of the witnesses Fargo had given him, or the names of the people he had spoken to on the telephone. Dongvillo could not find his file or his notes from Fargo's case. *Id.*

Dongvillo testified that the first time he and Fargo talked about an alibi defense "in seriousness" was about two or three months after his representation of Fargo began. Dongvillo spoke to one man and one woman from Fargo's alibi witness list on the telephone, but could not recall their names. After speaking with these witnesses, Dongvillo concluded that neither of them had an independent recollection of the times and places that they had been with Fargo that would have provided Fargo with an alibi defense. Dongvillo said that the persons he spoke to "didn't know the dates that we're talking about and they weren't even sure about the person that we were talking about." Dongvillo later stated that the two people he spoke to did know Fargo, and that if he had stated otherwise, he had spoken mistakenly.

Dongvillo also testified that, after interviewing these two potential witnesses, he believed that the only way they would be useful alibi witnesses was "if somebody gave them the detailed information that they needed to testify to and I wasn't about to do that."

Dongvillo acknowledged that Fargo had filed a grievance with the Attorney Grievance Commission, which was pending during Fargo's trial. The matter of the alibi witnesses was raised in the grievance. Dongvillo had not brought his response to the grievance to the *Ginther* hearing. He did not respond when asked if the subpoena for the hearing he had received was a subpoena duces tecum. Dongvillo testified that, the way he saw the subpoena, he was simply supposed to appear in court to be available to testify. In any event, he had been unable to find his file or notes from Fargo's case.

Dongvillo recalled that the prosecutor had told him Fargo was suggesting to people to provide untruthful testimony. Asked if the prosecution had named Candy Johnson, Gina Johnson, and Mary Quinn as being among those people, Dongvillo said he was not sure.

Dongvillo testified that he told Fargo about a month before trial that his witnesses did not establish an alibi for him. Dongvillo said that Fargo did not argue about this matter, or give him any additional witnesses to contact. Dongvillo testified that he would not be surprised to learn that Fargo had written letters to the trial court and to him before the trial concerning alibi witnesses. However, he could not be positive, because he did not have the file or his notes.

## C. State–Court Rulings

The trial judge first stated that the only letter from Fargo "being presented today is the second letter." This letter was written closer to Fargo's trial date than his first letter. The second letter did not complain of defense counsel's handling of Fargo's alibi defense. The trial judge con-

cluded from this that the matter of alibi witnesses was not then a dispute between defense counsel and Fargo, "[b]ecause if it had, it would have been in that—in the second letter."

The trial judge then addressed the matter of Fargo's potential alibi witnesses. The judge found that there was a "window" of time during which Fargo could have committed the crime, even if the testimony of his alibi witnesses as to how long they had been with Fargo on April 23, 1992, was accepted as true. The judge noted that Johnson had said it was still light when she left Fargo and that Wilby had said Fargo arrived at his house shortly after it became dark. The judge then reasoned as follows in reaching his finding that, even if the alibi witnesses were right about how long they had been with Fargo on the night in question, he could have committed the crime when the complainant said he did:

> Miss Johnson said it was light out when they left and Mr. Wilby said that the defendant arrived shortly after it had been light out. Now this is an interesting window, because that actually could put the contact with both Wilby and Johnson before the time that the victims [sic] are saying that the CSC occurred. *If you pick a time of either seven or eight o'clock for darkness*, if the persons then had been at the beach, there was time to go to the defendant's apartment, which is immediately next to the beach, and to have been there for an hour or so, to have had some drinks, and then for the defendant and the two girls to have gone their own way. You then have a window as to whether the defendant went straight to Wilby's, whether Mr. Wilby, who says he arrived shortly after dark, was tired. He testified he fell asleep. He testified that the defendant was there about and hour and [a] half. *If that gets us up to roughly seven or even eight o'clock when the defendant arrived at Wilby's and if he stayed an*

> *hour, hour and a half, that puts us from either 7:00 to 9:30 or 8:00 to 10:00.*

(emphasis added).[13]

Thus, based on his belief that it must have gotten dark by 7:00 or 8:00 p.m. on the day in question, the trial judge found that, even if Fargo's alibi witnesses were correct about how long they had been with him, Fargo still could have left Wilby's in time to commit the crime when the complainant said he did.

The trial judge credited defense counsel's testimony that he called two potential witnesses on the telephone. Having found that the potential alibi witnesses' testimony still left Fargo a window of time within which to have committed the crime, the judge found that the witnesses who spoke with defense counsel "would not have provided an alibi defense." On this basis, the trial judge concluded that defense counsel did not fail to properly investigate Fargo's alibi defense and denied his motion for a new trial.

The Michigan Court of Appeals affirmed Fargo's conviction and sentence stating that:

> The trial court had ample basis on the record for discounting the testimony of defendant's purported alibi witnesses and for accepting the testimony of defendant's trial counsel that, first, two at least of the alibi witnesses claimed by defendant at the time of trial had been interviewed without a basis for an alibi defense being identified, and second, that counsel was legitimately fearful that further alibi witnesses would be the product of a perjurious conspiracy.

*People v. Fargo*, Michigan Court of Appeals Docket No. 158594.

The Michigan Court of Appeals stated that a claim of ineffective assistance of counsel cannot be based on the refusal to present perjured testimony, or the failure to present an alibi defense which does not

---

**13.** Actually, if Fargo arrived at Wilby's at 7:00 or 8:00 p.m. and stayed either an hour or an hour and a half, he would have been there either 1) from 7:00 to 8:00 or 8:30 p.m. or 2) from 8:00 to 9:00 or 9:30 p.m.

fully account for the defendant's presence at the time of the crime. The Michigan Court of Appeals also stated that: "The record establishes that defendant's trial counsel did investigate the alibi and only abandoned pursuit of such defense after ascertaining that an alibi based on legitimate evidence could not be adduced." *Id.* The Michigan Supreme Court denied review with two Justices indicating they would grant review.

It should be noted that there was no testimony that defense counsel talked to more than two of Fargo's potential alibi witnesses. Further, defense counsel admitted that he did not remember the names of the potential witnesses he spoke to on the telephone or the names of the potential witnesses Fargo had given him. Additionally, Quinn, Johnson, and Wilby all testified that they did not speak to Fargo's defense counsel before trial.

The trial court did not make any findings that Fargo's alibi witnesses were testifying untruthfully, or that there was any perjurious conspiracy. On the contrary, the trial judge's analysis credited the testimony of Quinn, Johnson, and Wilby about how long they had been with Fargo, Johnson's testimony that Fargo and the women had parted while it was still light, and Wilby's testimony that Fargo arrived just after dark. The judge did not credit these witnesses' testimony about the time of day they said it was when they were with Fargo. Rather, the judge made his own estimated calculations about when they had been with Fargo by crediting the testimony noted above and assuming that it got dark that day at either 7:00 or 8:00 p.m. The trial judge never said or implied that Quinn, Johnson, or Wilby were intentionally testifying untruthfully about the time of day they had been with Fargo.

## III. Analysis

### A. The AEDPA Standard of Review

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (April 24, 1996)("AEDPA" or "the Act"), govern this case because Petitioner filed his habeas corpus petition after the effective date of the Act. *Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

The AEDPA altered the standard of review that a federal court must use when reviewing applications for writs of habeas corpus.

As amended, 28 U.S.C. § 2254(d) provides that:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

The United States Supreme Court has recently addressed the question of the proper interpretation of the amendments to the habeas corpus statute concerning entitlement to relief. The Supreme Court has stated that "[i]n sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000). The Supreme Court summarized the standard of review as follows:

Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application

of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams,* 120 S.Ct. at 1523.

■ "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams,* 120 S.Ct. at 1521. The reviewing court should not inquire whether all reasonable jurists would agree that the state court's decision was reasonable or unreasonable. The reviewing court must be aware that "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams,* 120 S.Ct. at 1522. However, a postulated complete unanimity of the entire federal judiciary that a state court decision is unreasonable is not required before the reviewing court may conclude that the decision in question includes at least one dispositive unreasonable application of clearly established federal law.

■ Where constitutional trial error has been shown and the reviewing court concludes that the error had a substantial and injurious effect or influence in determining the jury's verdict, a state court ruling finding such error harmless beyond a reasonable doubt is outside the realm of plausible, credible outcomes and the petitioner is entitled to habeas relief. *Barker v. Yukins,* 199 F.3d 867 (6th Cir.1999), *cert. denied,* 530 U.S. 1229, 120 S.Ct. 2658, 147 L.Ed.2d 273 (2000). "[A] state court's ap-plication of federal law is unreasonable and a writ may issue only if reasonable jurists would find it so arbitrary, unsupported or offensive to existing precedent as to fall outside the realm of plausible, credible outcomes." *Barker,* 199 F.3d at 871. "When a habeas court is in grave doubt as to the harmlessness of an error that affects substantial rights, it should grant relief." *O'Neal v. McAninch,* 513 U.S. 432, 445, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). "Only if a federal habeas court can say with certainty that a trial error had little or no impact on the judgment, should the judgment stand." *Barker,* 199 F.3d at 873.

■ The federal court reviewing a habeas petition must apply the presumption of correctness to evidence-supported factual determinations made by a state court. *West v. Seabold,* 73 F.3d 81, 83 (6th Cir. 1996); *cert. den.* 518 U.S. 1027, 116 S.Ct. 2569, 135 L.Ed.2d 1086 (1996); *Lundy v. Campbell,* 888 F.2d 467, 469 (6th Cir.1989), *cert. denied,* 495 U.S. 950, 110 S.Ct. 2212, 109 L.Ed.2d 538 (1990). This presumption may only be overcome by the presentation of clear and convincing evidence by the petitioner. 28 U.S.C. § 2254(e)(1).

## B. Ineffective Assistance of Counsel Claims and *Strickland v. Washington*

Fargo claims that he was denied the right to effective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and "[i]t is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.' " *Williams,* 120 S.Ct. at 1512. In order to establish ineffective assistance of counsel, Petitioner must show that counsel's deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. at 691–92, 104 S.Ct. 2052. First, Petitioner must show that counsel's performance was deficient and "fell below an objective stan-

dard of reasonableness." *Id.* at 687–88, 104 S.Ct. 2052.

In *Strickland* the Supreme Court cautioned that in conducting an ineffective assistance review the reviewing court should afford counsel a great deal of deference:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Strickland* at 689, 104 S.Ct. 2052.

After these explanations, the *Strickland* Court turned to a consideration of the second, "prejudice" prong of its test, noting that even professionally unreasonable errors do "not warrant setting aside the judgment of a criminal proceeding if the error[s] had no effect on the judgment." *Id.* at 691, 104 S.Ct. 2052. *But see, United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Except in certain limited circumstances, "ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067. To do so, the Court explained,

> [i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding.... On the other hand, we believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case....

> . . . . .

> [T]he appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution, and in the test for materiality of testimony made unavailable to the defense by Government deportation of a witness. *The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.*

*Id.* at 693–94, 104 S.Ct. 2052 (emphasis added) (citations omitted).

The Supreme Court then explained how to apply this different outcome standard to alleged trial errors:

> The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors. When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.

*Id.* at 695, 104 S.Ct. 2052.

Thus, to prevail on his ineffective assistance claim, Fargo must show that counsel's deficient performance prejudiced the defense. Fargo must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been differ-

ent. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The likelihood of a different result need only be reasonable. Fargo "need not prove prejudice by a preponderance of the evidence." *Jemison v. Foltz,* 672 F.Supp. 1002, 1007 (E.D.Mich.1987). In the present case, Fargo must show that there is a reasonable probability that, but for trial counsel's unprofessional errors, he would have been found not guilty at trial. The Court must assess the ineffective assistance claim in relation to the evidence of the petitioner's guilt. "[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury .... a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland* at 695–96, 104 S.Ct. 2052.

■ This Court is reviewing Petitioner's ineffective assistance claim under the AEDPA. This requires the habeas Court to review the state court decision and determine whether it was contrary to clearly established Federal law as determined by the Supreme Court or involved an unreasonable application of Federal law. Where the state court applies the correct legal rule established by the Supreme Court, the habeas court must determine whether the state court has applied the rule reasonably. 'When conducting review under the unreasonable application clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams,* 120 S.Ct. at 1522.

This Court's inquiry begins by looking at the decisions of the trial court and the Michigan Court of Appeals. Neither court stated the rule of decision under which it

reviewed Petitioner Fargo's ineffective assistance claim. However, it is apparent . that both the trial court and the Michigan Court of Appeals ruled that Fargo was not denied effective assistance, because both courts found Fargo failed to show that it was attorney error to decline to further investigate, prepare, or present Fargo's alibi defense.[14] This Court must determine whether these decisions were contrary to or unreasonable applications of clearly established federal law and whether these decisions were based on an unreasonable determination of the facts.

**C. Defense Counsel's Performance**

The state courts did not identify *Strickland v. Washington* as the source of the rule of decision to determine whether attorney Henry Dongvillo's performance deprived Fargo of his right to effective assistance of counsel. However, the state trial and appellate courts' rulings that Fargo was not denied effective assistance, because he failed to demonstrate unreasonable attorney error is consistent with the rule from *Strickland* that, absent a finding of unreasonable attorney error, the reviewing court need not address the question of prejudice. Therefore, this court concludes that these courts' rulings were not "contrary to" clearly established federal law, here *Strickland,* in this respect.

At trial attorney Dongvillo cross-examined Sheila Ruggero about whether she had other boyfriends besides Fargo. She replied that she did, but denied having done "anything with them." Dongvillo then ended this line of questioning. Dongvillo asserted Fargo's innocence in his brief final statement. However, the defense did not present any witnesses or other exculpatory evidence.

Trials on charges of sexual assault often boil down to a "swearing match" or credibility contest between the complainant and

14. Consequently, neither court discussed whether declining to further investigate, prepare, and/or present Fargo's alibi defense prejudiced him. Perhaps for the same rea- son, neither the trial court, nor the Michigan Court of Appeals, stated its view of the strength of the evidence of Fargo's guilt.

the defendant, because most human sexual contact involving sexual penetration occurs in private where no one but the complainant and defendant are present and because consent is a defense to forcible sexual assault. *United States v. Enjady,* 134 F.3d 1427, 1430–33 (10th Cir.1998). This is particularly likely where there is an absence of physical injury to the complainant and absence of physical evidence of sexual contact between the complainant and defendant, as in this case.

██ Consent is not a defense to a charge of third degree criminal sexual conduct grounded on the age of the complainant, commonly referred to as statutory rape. Nonetheless, a trial on statutory rape charges also may amount to a credibility contest, because of the private nature of such sexual contact when it does occur. This is what Fargo's trial was. However, because Fargo did not testify and did not present an alibi defense, his denial of the complainant's charges was set forth solely in defense counsel's brief statements to the jury and by implication in his limited cross-examination of the complainant. In brief, Fargo's trial was a swearing match in which only one side swore.

Attorney Dongvillo did not dispute that Fargo informed him of the existence of potential alibi witnesses some months before the trial. Dongvillo testified that he could not remember how many potential alibi witnesses Fargo named in a written letter or list Fargo gave him, or the names of these potential alibi witnesses. Dongvillo testified that he spoke to two potential witnesses whose names he could not remember and concluded that "they were not good alibi witnesses." Consequently, Dongvillo did not further investigate, prepare, or present an alibi defense on Fargo's behalf.

The trial judge ruled that Dongvillo did not fail to properly investigate Fargo's alibi defense. The trial judge reasoned that, despite Dongvillo's inability to testify specifically about what the two witnesses he contacted had said, Dongvillo's conclusion that they would not have provided an alibi defense was consistent with the court's view that, even if the testimony of Quinn, Johnson, and Wilby as to how long they were with Fargo was accepted, Fargo still could have committed the crime when the complainant alleged it occurred.

Analysis of the record and judicially noticed facts shows that the trial judge's ruling that Dongvillo did properly investigated Fargo's alibi defense is based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2). It also is an unreasonable application of clearly established federal law.[15]

The trial judge based his ruling that the potential alibi witnesses would not have provided an alibi defense on his belief that it must have been dark by 7:00 or 8:00 p.m. on April 23, 1992. In analyzing whether Fargo's potential alibi witnesses could have provided him with a valid defense, the trial judge arbitrarily "pick[ed] a time of either seven or eight o'clock for darkness." The judge then noted that Johnson said it was light when the women left Fargo's and Wilby said Fargo arrived at his nearby residence shortly after dark and stayed about an hour or an hour and a half. The judge then concluded, that this time line indicated that Fargo would have been at Wilby's from about seven o'clock until eight or eight-thirty, or from eight o'clock until nine or nine-thirty and, therefore, would have had time to commit the charged offense at between nine-thirty or ten as alleged.

---

**15.** The overall question of whether the petitioner received the effective assistance of counsel is a mixed question of law and fact. *Barnes v. Elo,* 231 F.3d 1025, 1027–28 (6th Cir.); *Sherrill v. Hargett,* 184 F.3d 1172, 1175 (10th Cir.1999). In the present case it can be shown that the trial court's decision that counsel conducted a reasonable investigation of Fargo's alibi defense was based on an unreasonable determination of fact.

The trial judge's finding is based on an unreasonable determination of the facts in light of evidence presented at the *Ginther* hearing. Objective, irrefutable evidence shows that it did not get dark at 7:00 or 8:00 p.m. in Ludington, Michigan on April 23, 1992. In fact, as recorded and established by the U.S. Naval Observatory, sunset was at 8:40 p.m. and the end of civil twilight occurred at 9:11 p.m. in Ludington on that date.[16] Before sunrise and after sunset there are periods of time, known as twilight, during which natural light is reflected on the Earth from the upper atmosphere, which receives direct sunlight and reflects part of it towards the Earth. In the morning before the beginning of civil twilight and in the evening after the end of civil twilight, artificial illumination is normally required to carry on ordinary outdoor activities. However, complete darkness begins sometime after the end of evening civil twilight.[17]

Thus, the trial court's assumption that it must have gotten dark at 7:00 or 8:00 p.m. on April 23, 1992, was clearly erroneous. On the contrary, sunset did not occur until 8:41 p.m. that evening, civil twilight ended at 9:11 p.m., and it became completely dark some time thereafter. Further, Quinn and Johnson both testified that they left Fargo's some time after 9:00 p.m. and Wilby testified that Fargo arrived at his house at about 9:30 or 10:00 p.m.

"A state court factual determination is unreasonable if it is so clearly incorrect that it would not be debatable among reasonable jurists." *Jeffries v. Wood,* 114 F.3d 1484, 1500 (9th Cir.1997)(internal quotation omitted). The Supreme Court stated in *Williams v. Taylor,* interpreting 28 U.S.C. § 2254(d)(1), that the writ may issue when "the state court's application of clearly established federal law was objectively unreasonable." *Williams,* 120 S.Ct. at 1521. 28 U.S.C. § 2254(d)(2) prohibits the grant of the writ unless the adjudication of the claim resulted in a decision based on an unreasonable determination of the facts. Because the language of these two sections concerning an "unreasonable application of clearly established federal law" and an "unreasonable determination of the facts" are quite similar, it follows that the writ may issue when the state court's decision is based on a determination of the facts which was objectively unreasonable. Additionally, prior to the adoption of the AEDPA, a federal court could reject a state court's finding of fact which was not supported by the record. *Lundy,* 888 F.2d at 469; *Fowler v. Jago,* 683 F.2d 983, 988 (6th Cir.1982); *Woods v. Armontrout,* 787 F.2d 310, 313 (8th

---

**16.** This Court has taken judicial notice of these facts *sua sponte* and on Petitioner's motion. FRE 201 allows the court to take judicial notice of adjudicative facts. The advisory committee notes to FRE 201(a) state that "[a]djudicative facts are simply the facts of the particular case." "Adjudicative facts are facts that normally go to the jury in a jury case." *Qualley v. Clo–Tex Intern., Inc.,* 212 F.3d 1123, 1128 (8th Cir.2000)(internal quotation omitted). This Court concludes that the actual time of sunset, evening civil twilight or dusk, and complete darkness are adjudicative facts in the present case.

"A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be disputed." FRE 201(b). The United States

Naval Observatory publishes complete Sun and Moon data which may be found by searching for a particular date and a particular latitude and longitude. See, *http://aa.usno.navy.mil/AA/data/docs/RS One-Day.html*. This Court concludes that the time of sunset and the end of civil twilight are facts capable of accurate and ready determination by resort to sources whose accuracy is not subject to reasonable dispute and which, therefore, may be properly judicially noticed.

**17.** Complete darkness ends sometime before the beginning of morning civil twilight. Civil twilight is defined geometrically to begin in the morning, and to end in the evening, when the center of the Sun is 6 degrees below the horizon. This is the limit at which indirect twilight illumination (from upper-atmosphere reflection) is sufficient, under good weather conditions, for terrestrial objects to be clearly distinguished.

Cir.1986)(factual findings lacking even fair support in the record are not entitled to presumption of correctness). This Court believes that these pre-AEDPA cases may also provide guidance for determining when a state court finding of fact is objectively unreasonable, as these cases themselves followed the principle that evidence-supported state court findings of fact are entitled to deference.

■■■ This Court concludes that a factual finding (or assumption) which lacks any record support, which is contradicted by evidence in the record, and which is shown to be factually wrong by information which is readily accessible and unquestionably accurate is an objectively unreasonable determination of the facts under § 2254(d)(2).

This Court is aware that evidence-supported factual determinations by a state court are entitled to a presumption of correctness. *West v. Seabold,* 73 F.3d at 83. This presumption may be overcome by clear and convincing evidence rebutting the presumption of correctness. 28 U.S.C. § 2254(e)(1). This Court holds that the sunset and civil twilight data provided by the U.S. Naval Observatory and judicially noticed by this Court is sufficiently clear and convincing evidence which has effectively rebutted the presumption of correctness regarding the trial court's factual determination (or assumption) that it was dark in Ludington, Michigan, at 7:00 or 8:00 p.m. on April 23, 1992.

· Reasonable jurists would not find it debatable whether it was dark on April 23, 1992 at 7:00 or 8:00 p.m. in Ludington, Michigan. Fargo's witnesses provided evidence that it was not dark at that time and no contrary evidence was presented. Moreover, objective data judicially noticed from the U.S. Naval Observatory records establishes that it was not yet dark at 7:00 or 8:00 p.m. on April 23, 1992, in Ludington, Michigan, where the crime in question was alleged to have been committed. Yet, the trial judge's ruling that Fargo's witnesses would not have provided support for an alibi defense was based on this mistaken finding (or assumption) of fact. Consequently, the trial court's finding that Fargo would have had a window of time within which to have committed the crime, even crediting his potential witnesses' testimony about how long they had been with him, was based on an objectively unreasonable determination of the facts in light of the evidence. The trial judge's finding that Fargo's potential alibi witnesses, Quinn, Johnson, and Wilby, did not establish an alibi is objectively unreasonable, because it is based on an indisputably erroneous finding (or assumption) of fact. Accordingly, the trial judge's conclusion that defense counsel did not fail to properly investigate Fargo's potential alibi defense is likewise objectively unreasonable for this reason.[18]

The trial judge's implicit finding that defense counsel talked to two of Fargo's alibi witnesses before trial was also objectively unreasonable. Defense counsel could not remember the names of the witnesses he spoke to, the names of the witnesses on the list provided by Fargo, or how many names were on the list. De-

---

**18.** This Court is aware that, unfortunately, the sunset and civil twilight facts set forth in this opinion were not introduced at the *Ginther* hearing and were not before the Michigan trial and appellate courts. However, as noted, Fargo's witnesses provided testimonial evidence that it was not dark yet at about 9:00 p.m. This evidence was not contradicted by evidence disputing the time of darkness on the day the in question. Furthermore, this Court believes that it was inherently arbitrary and unreasonable for the trial judge to simply "pick" a time for darkness and evaluate the defendant's entire potential alibi defense and motion for a new trial on this basis. Since facts readily accessible then and now and not subject to reasonable debate show that the trial judge's "pick" was not only arbitrary, but also materially mistaken, this Court believes that the trial judge's decision that Fargo's potential witnesses would not have provided an alibi defense is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, although actual sunset and civil twilight data was not before the trial court.

fense counsel said neither of the potential witnesses he spoke to were able to give information which would have substantiated an alibi defense. Defense counsel did not testify specifically as to what these potential witnesses he spoke to had to say. He only stated that they could not support a valid alibi defense. Furthermore, the trial judge credited the testimony of the three potential alibi witnesses as to how long they said they had been with Fargo the evening of the crime and relied upon this testimony in his analysis. While, based on his mistaken belief about when it got dark that night, the judge apparently believed that these witnesses had to be mistaken about *when* they had been with Fargo, he did not dismiss their testimony completely, or indicate in any way that he considered it perjured. On the contrary, his analysis accepted their testimony about how long they had been with Fargo as true.

All three of Fargo's potential alibi witnesses testified that 1) they did not speak to defense counsel before the trial, 2) they were with Fargo immediately before, during, and after the time the offense was alleged to have been committed, and 3) they were available to testify as to these matters at trial and expected to be contacted by Fargo's defense counsel before trial. All three gave testimony which would have helped substantiate an alibi defense for Fargo and said they were aware of the significance of this information before Fargo's trial.

Nonetheless, the trial judge implicitly found that the two witnesses defense counsel testified that he spoke to were two of the three potential alibi witnesses who testified at the *Ginther* hearing. Under these circumstances, this Court concludes that this implicit finding of fact by the trial judge was objectively unreasonable.

 This Court also finds that it was an unreasonable application of federal law to conclude that speaking to two out of three potential alibi witnesses was reasonable investigation by defense counsel. Counsel must engage in a reasonable amount of pretrial investigation and "at a minimum, … interview potential witnesses and … make an independent investigation of the facts and circumstances of the case." *Nealy v. Cabana,* 764 F.2d 1173, 1177 (5th Cir.1985). "[W]hen alibi witnesses are involved, it is unreasonable for counsel not to try to contact witnesses and ascertain whether their testimony would aid the defense." *Bryant v. Scott,* 28 F.3d 1411, 1415 (5th Cir.1994)(internal quotation omitted). Defense counsel owed Fargo "a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. "A failure to investigate can certainly constitute ineffective assistance." *Washington v. Smith,* 219 F.3d 620, 630 (7th Cir.2000).

In the present case, defense counsel testified that he spoke to two potential witnesses on the telephone. He could not recall the names of either potential witness, but said that one was a man and the other a woman. Defense counsel did not allege that he made reasonable efforts to contact a third potential alibi witness, but was unable to do so. Assuming for the sake of argument that defense counsel talked to Quinn or Johnson (the two women) and to Wilby (the man), this Court finds that the trial court's decision that, by talking to two out of three potential witnesses on the phone trial counsel conducted an adequate investigation into to possibility of presenting Fargo's alibi defense, was objectively unreasonable under *Strickland.*

This Court recognizes that defense counsel's resources are not unlimited and that counsel's judgment in the effective use of time is entitled to deference. This Court does not hold that effective assistance of counsel always requires conducting or attempting to conduct an interview of every claimed alibi witness in all cases. However, in a case where consent was not a defense and identity was not an issue, that is, where a denial that the crime

charged occurred at all was the only possible defense, the value of potential alibi witnesses cannot be underestimated. Further, Fargo did not claim to have an enormous number of alibi witnesses which defense counsel could not reasonably be expected to contact. Fargo claimed to have three alibi witnesses. It was unreasonable attorney error not to make strenuous efforts to contact all three of Fargo's potential alibi witnesses. Competent counsel would have recognized that all of these potential witnesses were potentially extremely important. Even if two of these witnesses were actually contacted and could not immediately provide information that substantiated an alibi defense, this does not mean that the third could not have. It was entirely possible that the third potential alibi witness would be the best of all. It would be unreasonable and arbitrary to assume that because two potential witnesses did not seem promising a third was not worth attempting to contact.

It is also possible that information from the third potential witness might have been useful in conducting further interviews with the other two potential witnesses, by providing facts which might be used to trigger independent recollections by the other witnesses. This is particularly true regarding Johnson, because in addition to alibi evidence, she also had potential information which might have substantiated a defense claim that the complainant had a motive to fabricate her allegations against Fargo, and might have helped the defense develop a theory of the case.

In short, this Court concludes that, if for the sake of argument it is accepted as true that defense counsel spoke to two out three of Fargo's potential alibi witnesses,

the trial judge's conclusion that interviewing two out of three of these potential alibi witnesses was reasonable attorney performance of pre-trial investigation is an unreasonable application of controlling federal law. *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.") [19]

The Michigan Court of Appeals also rejected Fargo's ineffective assistance of counsel claim. The Michigan Court of Appeals found that the trial court's findings of fact at the conclusion of the *Ginther* hearing were not clearly erroneous. The Michigan Court of Appeals also found that "[t]he record establishes that defendant's trial counsel did investigate the alibi and only abandoned pursuit of such defense after ascertaining that an alibi based on legitimate evidence could not be adduced." *People v. Fargo,* Michigan Court of Appeals Docket No. 158594.

This Court has concluded and explained that 1) the trial court's finding of fact that the two witnesses interviewed by defense counsel would not have provided an alibi defense was based on an unreasonable determination of the facts regarding the time of darkness on the evening in question and 2) the trial court's finding of fact that defense counsel interviewed two of the three potential alibi witnesses was also an unreasonable determination of the facts. This Court has also determined that interviewing only, at most, two of Fargo's thee

---

**19.** If the first two potential alibi witnesses had provided information which substantiated Fargo's alibi defense, competent counsel would have also contacted the third potential alibi witness. The testimony of three alibi witnesses who (considered together) claimed they were with Fargo at about the time that Ruggero said Fargo sexually penetrated her would not have been cumulative. "Evidence

is cumulative when it 'supports a fact established by existing evidence.' BLACK'S LAW DICTIONARY 577 (7th ed.1999), but [Fargo's whereabouts at the time Ruggero said that sexually penetrated her at his apartment] was far from established—it was the issue in the case." *Washington v. Smith,* 219 F.3d at 633–34.

potential alibi witnesses would also have been unreasonable attorney error. This Court concludes that the Michigan Court of Appeals decision denying Fargo's ineffective assistance of counsel claim on the basis of facts found by the trial court is objectively unreasonable 1) because it relies upon the trial court's unreasonable determination of the underlying facts concerning whether Fargo's potential alibi witnesses provided information that would have substantiated an alibi defense and 2) because it is an objectively unreasonable application of *Strickland* as to whether interviewing two out of three potential alibi witnesses was reasonable attorney investigation.

This Court concludes that the Michigan Court of Appeals decision finding that trial counsel performed as reasonably competent counsel in investigating Fargo's potential alibi defense is objectively unreasonable and based, in part, on unreasonable determinations of facts.

**D. Prejudice to Fargo**

 Showing that trial counsel made unreasonable and serious errors in the investigation, preparation, and presentation of his defense is not sufficient to entitle Fargo to his desired writ of habeas corpus. Fargo must also show that he was prejudiced by trial counsel's incompetent performance. Under *Strickland*, Fargo "must show that there is a reasonable probability that, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052; *Williams*, 120 S.Ct. at 1513.

The case against Fargo was far from unassailable and the Court recognizes that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696, 104 S.Ct. 2052. The only evidence of Fargo's guilt apart from Sheila Ruggero's allegations was some evidence that Fargo initially denied knowing Ruggero to the police and Adeline War-

ner's testimony that Ruggero appeared upset after leaving Fargo on the night in question and her limited and ambiguous hearsay statement that Ruggero said Fargo "had taken her to bed and she did not want to." There was no physical evidence that Fargo had sexual relations with Ruggero. Nor was there any physical evidence that Ruggero suffered any physical injury to her genitalia or any other parts of her body. Ruggero testified that she had known Fargo for about two years and that penetrative sexual behavior had only first occurred about one week before the alleged sexual penetration in Fargo's apartment. Defense counsel could have argued that since Fargo and Ruggero had known and related to each other for about two years without having sexual relations, it was possible that they never had. The evidence of Fargo's guilty was not overwhelming. In essence, "this trial was a credibility contest." *Washington v. Hofbauer*, 228 F.3d 689, 707 (6th Cir.2000). However, as previously noted, it was a credibility contest in which the defense opposed the complainant's sworn testimony and that of several other witnesses with cross-examination and argument by defense counsel alone, without providing a theory of the case that might have explained why Ruggero would falsely accuse Fargo of this crime, or evidence supporting Fargo's claim of innocence.

This Court has found that defense counsel committed unreasonable attorney error by not further investigating Fargo's alibi defense and that the state courts' decisions finding that this was not serious attorney error are objectively unreasonable under *Strickland*, and based in part on unreasonable determinations of fact. This Court also finds that declining to further investigate, prepare, and present an alibi defense prejudiced Fargo. If the alibi witnesses who testified at the *Ginther* hearing had testified at Fargo's trial, there is a reasonable probability that Fargo would have been found not guilty. All Fargo needed to do was to establish reasonable doubt. There is a reasonable probability that tes-

timony of the three alibi witnesses who testified at the *Ginther* hearing would have created reasonable doubt. *Washington v. Smith*, 219 F.3d at 634. Accordingly, this Court finds that the Michigan Court of Appeals' ruling that Fargo was not denied the effective assistance of counsel is an objectively unreasonable application of *Strickland.*

This Court further finds that Fargo has shown that trial counsel's failure to adequately investigate, prepare, and present Fargo's alibi defense had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *Gilliam v. Mitchell*, 179 F.3d 990, 995 (6th Cir.1999); *see also, O'Neal v. McAninch*, 513 U.S. at 445, 115 S.Ct. 992 (holding that habeas court should grant relief if it has "grave doubt" whether trial error had a substantial and injurious effect or influence on the verdict).

In his answer to Fargo's habeas petition, Respondent claimed that "[s]ince darkness does not arrive in Michigan in April at 9:30 p.m., but rather at 7:00 or 8:00 p.m., the trial court concluded that the time periods which the witnesses estimated based upon the fall of darkness were at least an hour and a half earlier than indicated." Respondent's Answer at 6–7. Respondent then maintained that: 1) "Petitioner has presented nothing to indicate that the trial court's factual determination was clearly incorrect," 2) the trial court's ruling that trial counsel performed an adequate investigation of Fargo's alibi was a proper conclusion based on this factual determination, and therefore 3) Fargo failed to show that he was deprived of effective assistance of counsel. *Id.* at 8–9.

Now that it has been shown by more than clear and convincing evidence that the factual determination (assumption) underlying the trial court's denial of Fargo's ineffective assistance claim was materially and demonstrably mistaken, or objectively unreasonable, Respondent contends that it doesn't matter. Thus, in his supplemental

answer, Respondent argues that, since (as noted by the trial judge) it was possible that Fargo might have committed the offense after leaving the company of the two women and before going to Dan Wilby's home, Fargo's alibi witnesses failed to provide him with "a complete alibi." Respondent now argues that this alleged failure of Fargo's potential alibi witnesses to provide him with a "complete alibi" adequately supports the conclusion that declining to further investigate, prepare, and present his alibi defense was not ineffective assistance. *Id.* at 8.

Respondent quotes the Michigan Court of Appeals decision which stated that ineffective assistance cannot be predicated "on the failure to present an alibi defense based on testimony which fails to fully account for defendant's presence at the relevant time." *People v. Fargo*, Michigan Court of Appeals Docket No. 158594 (citing *People v. McMillan*, 213 Mich.App. 134, 539 N.W.2d 553 (1995)).

An examination of *McMillan* shows the weakness of Respondent's argument. In *McMillan* the defendant was convicted of a kidnapping and murder. The abduction occurred at about midnight. The defendant contended that failure to present an alibi witness was ineffective assistance. However, the purported alibi witness had testified before a grand jury that she did not know where the defendant was between 9:30 p.m. and 2:00 a.m. the same night. The Michigan Court of Appeals concluded that, on the basis of this record, the purported alibi witness would not have provided the defendant with an "effective alibi" and therefore rejected his ineffective assistance claim. *McMillan*, 213 Mich. App. at 140–41, 539 N.W.2d 553. *McMillan* does not use the phrase "complete alibi," or state, suggest, or imply that an effective alibi witness must account for every possible minute when a crime may have been committed. Clearly, the possible time gaps in Fargo's alibi do not approach the length of those in *McMillan.*

This Court is not persuaded that a petitioner must show that potential, uncalled alibi witnesses would have provided testimony which, if believed, would have made it absolutely impossible for him or her to have committed a crime, before failure to investigate, prepare, and present an alibi defense is ineffective assistance.

The Due Process Clause of the Fourteenth Amendment protects an accused in a criminal case against conviction except upon proof beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). *See also, Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Consequently, the jury must be instructed in a criminal case that it may only convict if the prosecution establishes that the defendant is guilty beyond a reasonable doubt and that its decision must be based on a careful examination of the evidence. *Victor v. Nebraska*, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). In short, a criminal defendant is entitled to be found not guilty if the jury has a reasonable doubt as to his or her guilt. It is not necessary to provide evidence which, if believed, would make it impossible for the defendant to have committed a crime to create a reasonable doubt.

■ This Court believes that, if a known alibi witness, or a succession of known alibi witnesses, may be available to testify that the defendant was with them "at about the time" the crime was allegedly committed, this is sufficient to require competent counsel to fully investigate these witnesses. *Washington v. Smith*, 219 F.3d at 633. The testimony of Fargo's potential alibi witnesses was that he was with them (first with the two women, then with Dan Wilby) at about the same time when the sexual assault was allegedly committed. This testimony, if believed, could have created a reasonable doubt in the minds of the jurors about Fargo's guilt. But for counsel's failure to adequately investigate, prepare, and present these witnesses, there is a reasonable probability that the outcome of Fargo's trial would have been different. Therefore, failure to adequately investigate, prepare, and present these alibi witnesses was unreasonable attorney error which prejudiced Fargo. As a consequence, the Michigan Court of Appeals decision finding to the contrary is objectively unreasonable.

Further, in *Barker* the Sixth Circuit stated that:

> The Sixth Amendment and the Due Process Clause guarantee a defendant's constitutional right to a trial by jury. As the Supreme Court has recognized, the Sixth Amendment protects the defendant's right to trial by an impartial jury, which includes 'as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of guilty.' This right is further interpreted as prohibiting judges from weighing evidence and making credibility determinations, leaving these functions to the jury.

*Barker*, 199 F.3d at 874 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 277, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)).

This does not mean that a trial judge considering a motion for a new trial based on a claim of ineffective assistance of counsel may not consider the nature of the evidence the defendant claims trial counsel improperly failed to investigate, prepare, and present. However, it does mean that, where (as here) the evidence the defendant claims competent counsel would have developed and presented is of such a nature that, if believed, a reasonable jury could find a reasonable doubt upon its consideration, the trial judge may not short circuit the jury's role by basing his denial of the ineffective assistance claim on his or her own credibility determination regarding such evidence.

Accordingly, this Court concludes that, to the extent that the trial court and the Michigan Court of Appeals denied Fargo's ineffective assistance claim because his potential alibi witnesses may not have fully accounted for all of the time when the crime may have been committed, these

denials are objectively unreasonable and a denial Fargo's right to have a jury decide his guilt or innocence.

In the present case, the Michigan Court of Appeals' decision denying Petitioner's ineffective assistance of counsel claim was not merely wrong, it was objectively unreasonable. Summarizing, this Court finds that the Michigan Court of Appeals' decision denying Fargo's ineffective assistance of counsel claim is objectively unreasonable, because this Court has a definite and firm conviction that the Michigan Court of Appeals' decision finding that trial counsel adequately investigated Fargo's alibi defense was objectively unreasonable and based in part on unreasonable determinations of fact.

Further, this is a case where the evidence of Petitioner's guilt was not overwhelming. *Van Tran v. Lindsey*, 212 F.3d 1143, 1152–1154 (9th Cir.2000). Petitioner was convicted of a serious crime involving allegations of a twenty-six year old man manipulating and taking advantage sexually of fifteen year old girl. However, Petitioner was also denied the effective assistance of counsel. In other words, in a case where the proof of guilt was not overwhelming, "counsel's errors were so serious as to deprive the defendant of a fair trial, a whose result is reliable." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. But for these serious attorney errors, there is a reasonable probability that Petitioner would not have been convicted. *Id.* at 694, 104 S.Ct. 2052. The Michigan appellate courts' decisions denying Petitioner's ineffective assistance claims are objectively unreasonable under the governing *Strickland* standard. Therefore, Petitioner is entitled to habeas relief from his conviction and sentence and a new trial.[20]

**IV. Conclusion**

Based on the foregoing, this Court concludes that Petitioner's ineffective assis-

---

**20.** Petitioner contends that his sentence is improper because it is based in part on improper prosecutorial argument unsupported by record evidence that he was a drug abuser.

tance of counsel claim merits habeas relief. Petitioner's conviction is based in part on objectively unreasonable determinations of facts and involves an objectively unreasonable decision under clearly established Federal law, as determined by the Supreme Court of the United States in *Strickland v. Washington*, 466 U.S. at 693–696, 104 S.Ct. 2052 and *Williams v. Taylor*, 120 S.Ct. at 1519–1520.

Accordingly,

**IT IS HEREBY ORDERED** that the petition for a writ of habeas corpus is **CONDITIONALLY GRANTED.** The State of Michigan must provide Petitioner a new trial within ninety (90) days or release him. Should the State appeal this decision to the United States Court of Appeals for the Sixth Circuit, this order is stayed pending the disposition of that appeal.

February 6, 2001

---

Having found that Petitioner was denied the effective assistance of counsel and is entitled to a new trial, this Court declines to address his sentencing claim.